```
 1              IN THE UNITED STATES DISTRICT COURT

 2                  EASTERN DISTRICT OF MICHIGAN

 3   UNITED STATES OF AMERICA          ) Bay City, Michigan
                                       ) March  24, 2022
 4      vs.                            ) 8:40 a.m.
                                       )
 5   JUSTIN WILLIAM ZUBE,              )
                                       ) Case No. 20-20491
 6      Defendant.                     )
     _____   )

 7

 8                 TRANSCRIPT OF TRIAL - VOLUME 2
              BEFORE THE HONORABLE THOMAS L. LUDINGTON
 9                  UNITED STATES DISTRICT JUDGE

10   APPEARANCES:

11   For the Government:  WILLIAM J. VAILLIENCOURT
                          ANN NEE
12                        United States Attorney
                          Eastern District of Michigan
13                        101 First Street
                          Suite 200
14                        Bay City, MI 48708

15   For the Defendant:   JEFFREY J. RUPP
                          Brisbois, Brisbois & Rupp, PLLC
16                        1107 Gratiot Avenue
                          Saginaw, MI  48602
17                        (Appearing via Zoom)

18

19

20

21   Court Reporter:     Carol M. Harrison, RMR, FCRR
                          1000 Washington Avenue
22                        Bay City, MI  48708

23

24              Proceedings reported by stenotype reporter.
            Transcript produced by Computer-Aided Transcription.
25
```

2

```
 1                          I N D E X

 2                                                      PAGE

 3    Opening statement by Mr. Vailliencourt            11

 4    Opening statement by Mr. Rupp                     18

 5
      WITNESSES FOR THE GOVERNMENT:
 6
      EVAN ZAPOLSKI
 7         Direct Examination By Ms. Nee                21
           Cross-Examination By Mr. Rupp                51
 8         Redirect Examination By Ms. Nee              54

 9    BRYAN BYARSKI
           Direct Examination By Ms. Nee                57
10         Cross-Examination By Mr. Rupp                63

11    AMY BELANGER
           Direct Examination By Ms. Nee                65
12         Cross-Examination By Mr. Rupp                69

13    EVAN ZAPOLSKI
           Direct Examination By Ms. Nee                71
14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1   EXHIBITS:                                                RCVD

 2    GX 1A     Photo                                          37
      GX 1B     Photo                                          37
 3    GX 1C     Photo                                          37
      GX 1D     Photo                                          37
 4    GX 1D-1 Photo                                            37
      GX 1E     Photo                                          37
 5    GX 1E-1 Photo                                            37
      GX 1M     Photo                                          37
 6    GX 2A     Coolpad Cell Phone                             47
      GX 3A     LG Cell Phone (Floor)                          49
 7    GX 4A     LG Cell Phone (Dresser)                        50
      GX 1F     Photo                                          61
 8    GX 1G     Photo                                          61
      GX 1H     Photo                                          61
 9    GX 1I     Photo                                          61
      GX 1I-1 Photo                                            61
10    GX 1J     Photo                                          61
      GX 1K     Photo                                          61
11    GX 1L     Photo                                          61
      GX 2B     Cellebrite Report                             101
12    GX 2C     Image                                         116
      GX 2D     Image                                         116
13    GX 2E     Image                                         116
      GX 2F     Image                                         116
14    GX 2G     Image                                         116
      GX 3B     Cellebrite Report                            140
15    GX 3C     Image                                         143
      GX 3D     Image                                         143
16    GX 3E     Image                                         143
      GX 3F     Image                                         143
17    GX 3G     Image                                         143

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S
 2           (At 8:40 a.m., proceedings commenced.)
 3           (Defendant present.)
 4      THE COURT:  Counsel ready to proceed?
 5      MR. VAILLIENCOURT:  We are, Your Honor.
 6      THE COURT:  If we can have the jury.
 7      THE DEFENDANT:  Your Honor, I need to inform you of
 8 something.
 9      THE COURT:  You can speak with your attorney.
10      THE DEFENDANT:  He won't bring this shit to you.
11      THE COURT:  You can go ahead.
12      THE DEFENDANT:  It's an issue about me and counsel.
13      THE COURT:  We'll take it up later, sir.
14      THE DEFENDANT:  Not allowed to prepare for this case
15 at all.  We didn't discuss anything until yesterday.  I believe
16 there was a very big lack of competency.
17           (At 8:43 a.m., jury arrives.)
18      THE COURT:  Good morning.
19      JUROR NO. 9:  Can I get one of those?
20      THE CLERK:  I only have the one.  Do you need a
21 hearing apparatus?  I can probably get one.
22           (Off-the-record discussion.)
23      THE COURT:  Ms. Winslow, if we could have the jury
24 sworn, please.
25           (At 8:44 a.m., jury sworn by the clerk.)
```

1          THE COURT:  I have a number of preliminary

2    instructions which I will provide, and then we'll proceed to

3    opening statements.

4          I'd like to speak to you briefly about the function

5    of the judge in a criminal trial and your function as jurors.

6    You've been sworn as the jury to try this case.  By your

7    verdict, you will decide the disputed issues of fact that exist

8    between the parties.  The Court will decide the questions of

9    law that arise during the course of the trial and before you

10   retire to deliberate at the close of the trial, we will

11   instruct you on the law that you are to follow and apply in

12   reaching your verdict.

13         It is my responsibility to conduct the trial of the

14   case in an orderly, fair and efficient manner, to rule upon

15   questions of law that arise during the course of the trial and

16   to instruct you about the law that applies to the case at the

17   conclusion.

18         You can look on my function, that is the function of

19   the Court, as that akin to being a referee or an umpire.  I

20   have no personal or professional interest in how this case

21   turns out and how it is decided.  My job is to see to it that

22   only legally admissible evidence is received in court and to

23   tell you what the law is during and at the end of the trial and

24   to settle any disputes between the attorneys that may arise

25   during the course of the trial.

1          You have already designated seat locations.  We would

2    ask that you maintain that order.  I notice Mr. Drabczyk had

3    you in good order making your way into the courtroom.  As you

4    will have noticed, it is easiest if you get into an order where

5    you can just simply single file your way into the jury box.

6          You've also been provided juror badges.  We would ask

7    that you maintain those badges when you are in the vicinity of

8    the courthouse.  It tells court employees and anyone else that

9    may be involved in the case, such as witnesses, the attorneys

10   that may be involved in the case that are not necessarily in

11   the courtroom who you are and what your role is.

12         You will find that the attorneys will try to maintain

13   some distance from you, and it's not because they're cold or

14   difficult people.  They simply will do that out of respect for

15   your responsibilities as jurors in this case.

16         We have talked about the hours that we will be in

17   session.  You will also be permitted to take notes during the

18   course of the trial.  You're not obligated to do so.  If you do

19   take notes, you should not be influenced by the notes of

20   another juror.  Rather, you should rely on your own

21   recollection of the evidence.  Note taking must not distract

22   you from what happens in court.

23         Also, your notes are not evidence in the case, and

24   they may not take precedence over the independent recollection

25   that you have of the evidence received during the course of the

1    trial.  Notes are only an aid to recollection, and they are not

2    entitled to any greater weight than actual recollection or the

3    impression that each juror has of the evidence.  All of the

4    notes taken by a juror will be destroyed at the conclusion of

5    the trial.

6          Let me briefly explain the general order of procedure

7    in the trial.  First, the attorney for the Government will make

8    an opening statement in which they outline their theory of the

9    case.  The attorney for the defendant may then make an opening

10   statement or he may reserve it until later on during the course

11   of the case.

12         The opening statements are not evidence.  They are

13   only intended to assist you in understanding the viewpoints and

14   claims of the parties.  After the opening statements, we will

15   begin the process of taking evidence.  The attorney for the

16   Government will present their evidence first.  They will call

17   witnesses and may offer exhibits, such as documents, physical

18   objects.

19         The attorney for the defendant has a right to

20   cross-examine the witnesses called by the Government in order

21   to test the truth and accuracy of their testimony, as well as

22   to elicit testimony that may be favorable to the defendant.

23         Following the Government's presentation, the

24   defendant has an opportunity to present evidence.  You should

25   clearly understand that a defendant in a criminal case is not

1  obligated to produce any evidence whatsoever.  The law does not

2  require the defendant in a criminal case to prove his innocence

3  or to produce any evidence.

4          Similarly, the attorney for the Government has a

5  right to cross-examine each of the witnesses called by the

6  defendant.  After all of the evidence has been presented, we

7  will provide you preliminary final instructions outlining the

8  law that applies to the case.

9          After the Court has given you those instructions, the

10  attorneys for both sides will have an opportunity to present

11  closing arguments to you in support of their case.  You are

12  again reminded the statements of the attorneys in closing

13  arguments, as in opening statements, are not evidence.  They're

14  merely intended to assist you in understanding the evidence and

15  the theory of each party.  You must base your decision only on

16  the evidence.

17          Following the closing arguments of the attorneys, I

18  will give you instructions on the manner of your deliberations,

19  and you will then retire and deliberate on your verdict.  You

20  will do that by applying the law as I give it to you to the

21  facts as you find them to be.

22          The function of the jury is to determine the facts.

23  You are the sole and exclusive judges of the facts, and you

24  alone determine the weight, the effect and the value of the

25  evidence as well as the credibility of each of the witnesses

1  that will be testifying.  You must consider and weigh the

2  testimony of all witnesses who appear before you, and you alone

3  are to determine whether to believe any witness and the extent

4  to which any witness should be believed.

5        It is your responsibility to consider any conflicts

6  in testimony which may arise during the course of the trial.

7  Your decision as to any fact in the case is final.  On the

8  other hand, it is your duty to accept the law as the Court

9  states it to you.

10        Your function as the jury is equally important to the

11  function of the Court -- Court and the attorneys.  You should

12  give careful attention to the testimony as it is presented to

13  you for your consideration.  Please keep an open mind and not

14  form or express an opinion about the case until you've heard

15  all of the evidence, the closing arguments of the attorneys and

16  the instructions that outline the law that applies to the case.

17        From this point forward, you must not discuss the

18  case with anyone, not even members of your family or your

19  fellow jurors.  It would be unfair for you to discuss the case

20  among yourselves or with family and friends before you retire

21  to consider your verdict with all of your fellow jurors.

22        So you may tell your family and friends that you've

23  been selected as a juror, but then you must tell them you are

24  instructed -- under instructions from the Court that you are

25  not to discuss the case with them until the Court permits you

1  to do so.

2          After the case is submitted to you for deliberations,

3  you still must discuss it only when the Court instructs you to

4  do so and only in the jury room and only in the presence of all

5  of your fellow jurors.  When the trial is over, you may discuss

6  the case with anyone you wish.  Until that time, we ask that

7  you control the natural desire to discuss the case both here

8  and at home.

9          The only information that you should receive about

10 this case should come to you while you are all together as a

11 jury and in the presence of the Court, the attorneys and the

12 parties that are involved.  You must not consider any

13 information which may come to you outside of the courtroom.

14         You must not visit any scene that is mentioned in the

15 evidence of the trial.  If it becomes necessary for you to

16 visit a scene or a place, you must not be taken -- you will be

17 taken as a group under the supervision of the Court.  You must

18 not consider as evidence any personal knowledge that you have

19 of a scene, a place, or location.

20         You must not make any investigations on your own.  I

21 know that many of you have smart phones and computers and that

22 you use them in daily life to research many issues, but they

23 may not be used during the course of the case to conduct any

24 research about the case or to communicate any information to

25 any other party.

1            A trial follows long established rules of procedure

2    and evidence.  The attorneys are trained in these rules and

3    from time to time may make objections and motions.  I will rule

4    on the objection and motions.  Most of the time I will make the

5    rulings in your presence.  You should not conclude from any of

6    my rulings that I have an opinion about the case or that I

7    favor one side or the other.  If I sustain an objection to a

8    question, and do not permit a witness to answer, you should not

9    guess what the answer might be or draw any inferences from the

10   question itself.

11            Please let me know immediately by raising your hand

12   if you cannot hear a witness or see what is being demonstrated.

13            Counsel, that is the complete set of preliminary

14   instructions I organized for this morning.  Any additions or

15   corrections, Mr. Vailliencourt?

16            MR. VAILLIENCOURT:  No, Your Honor.

17            MR. RUPP:  No, Your Honor.

18            THE COURT:  Government ready to proceed to opening

19   statement?

20            MR. VAILLIENCOURT:  Yes, we are.  Thank you, Your

21   Honor.

22            THE COURT:  Your floor, sir.

23            MR. VAILLIENCOURT:  Good morning.  Child pornography.

24   Just saying it makes your skin crawl.  Seeing it is even worse,

25   but actually possessing it is criminal.  And in this case,

1   you're going to hear about one person who possessed it, Justin

2   Zube; not just a picture or two, but a lot of them that were on

3   three different cell phones that police found in the

4   defendant's bedroom, and one of the phones had two videos on

5   it.  And because Mr. Zube possessed child pornography, that's

6   why we're all here today.

7          This case started when police received a tip, a tip

8   that they followed up and investigated, and it led them to

9   obtain a search warrant, which is a court order to search

10  Mr. Zube's residence and to look for and seize any evidence

11  involving the possession of child pornography.

12         On February 11th, 2020, police went to Mr. Zube's

13  residence at 118 South Lincoln in Bay City, Michigan, here in

14  Bay County in the federal Eastern District of Michigan.  Police

15  found Mr. Zube there along with his father, Randy.

16         They searched the house, they went into the

17  defendant's bedroom.  You'll see photographs of his room.  They

18  found a number of different electronic devices, but there's

19  three in particular that you're going to hear about over the

20  next few days.  On his bed police found a Coolpad cell phone.

21  They found another cell phone on the floor next to his bed and

22  a third one in top dresser draw of his bedroom.

23         You'll hear Detective Evan Zapolski from the Michigan

24  State Police.  He's been trained and is very experienced in

25  examining these kinds of devices for child pornography.  He

1  describe for you the processes that he followed and how he

2  found child pornography on each of the three devices found in

3  the defendant's bedroom.

4       The first, the Coolpad cell phone, had six images of

5  child pornography.  You'll see five of them here in court.  The

6  phone next to his bed had 74 images of child pornography, five

7  of which you'll see here, and two of which were also found on

8  the Coolpad that was on the defendant's bed.

9       Finally, on the phone in his dresser, Detective

10  Zapolski found 305 images and two videos.  You'll see seven of

11  those images, plus the two videos, and one of those images was

12  also on the phone next to his bed.

13       The two videos were in an app called Snapsaver, which

14  Detective Zapolski will tell you is an application used to

15  capture and save what's on your screen.  Here, the defendant

16  used Snapsaver to record videos playing on the internet.

17  Detective Zapolski will also be going over what he found on the

18  phones, how the various mail and other applications had

19  usernames and passwords from the defendant and how they all

20  opened with the same passcode.

21       He'll also describe for you how these images and

22  videos involved the defendant's cell phones and the internet.

23  You will hear how the defendant bookmarked pages, web pages,

24  like "naked teens," and "young porn pictures" or visited

25  websites with titles like, "little 8-year-old teen girl" and

1  "sexy blue dress smells virgin pussy" and "sexy 7-year-old

2  preteen girl strips for her dad."

3        Now, when I said child pornography, it's something

4  you're all going to know when you see it, but the judge will be

5  giving you a detailed instruction as to what it is under the

6  law, and it means any depiction in any kind of a format;

7  picture, video, electronic of sexually explicit conduct that

8  involves a minor.

9        The judge will tell you that sexually explicit

10  conduct means any kind of intercourse, whether it's genital to

11  genital, oral genital, anal genital, or any kind of lascivious

12  or sexual exhibition of a minor's genital or pubic area.   The

13  images you see will be graphic.   Many will involve children who

14  are prepubescent, before puberty and under 12.

15        I'm going to give you a preview, not to shock you,

16  but to give you an idea of what the defendant possessed and

17  what you'll see.   It's going to be images that include a nude

18  female toddler being anally penetrated by an adult male's

19  finger, an adult putting his penis in the mouth of a nude

20  prepubescent child, a nude prepubescent female child with one

21  of her wrists bound by a rope and an adult penis near her

22  mouth, a nude female child sitting on a nude adult male

23  engaging in anal or vaginal penetration, an adult penis

24  ejaculating on a nude prepubescent vagina, and anal penetration

25  of a prepubescent child by an adult's penis.

```
 1              Now, as I told you during jury selection, while we
 2   will be showing you the images of child pornography, it won't
 3   be all of the images, and we will give you fair warning and
 4   then show it for only a very short time, maybe about three
 5   seconds.
 6              Now, you'll also see the two videos.  They're both
 7   approximately 30 seconds each, but we'll go through them on
 8   fast forward, so that you'll only see them for less than 10
 9   seconds each, and that will be more than enough for you to see
10   that they are, in fact, child pornography.
11              But you're going to hear more than just what the
12   defendant found on the defendant's devices.  About two weeks
13   after the search warrant was executed, and before he was
14   charged, Mr. Zube reached out to Special Agent Doug Smith of
15   the FBI.  Mr. Zube wanted to know if he could get some of his
16   devices back, and he asked specifically about the Coolpad.
17   You'll hear Agent Smith testify how he explained to the
18   defendant that the devices hadn't even been examined yet, but
19   that if Mr. Zube would provide the passcodes for any of them,
20   well, that would facilitate things.  You will see how, in his
21   own handwriting, the defendant wrote down some of the codes for
22   almost all of the devices that were seized, but not for the
23   Coolpad.
24              And, oh, yes, Mr. Zube said he wanted to help.
25   Mr. Zube said that he thought he wasn't the kind of guy that
```

1   the FBI was looking for, that he was just a guy who was down

2   there, and he gestured with his hands, but that he knew guys

3   who were up here.

4           He said he knows those people exist because he had

5   seen them or had interacted with them online, and when he said

6   higher people, Mr. Zube admitted he meant people looking for

7   images of underage girls, and he knew this because he used

8   Snapchat.

9           Agent Smith told him that there were no promises, no

10  guarantees, and no potential benefit for the defendant.  But

11  despite that, you'll hear about the defendant's phone calls and

12  see text messages from the defendant providing information

13  about people that he said were providing online child

14  pornography.

15          Finally, Justin Zube's possession of all of this

16  child porn was not just something random, isolated or

17  accidental because Justin Zube had done this before.  In fact,

18  you will hear how he possessed child pornography in 2012.

19  You'll hear from Holly Elliott, who is a woman who's had two

20  children with the defendant.

21          She will describe how she discovered child

22  pornography on a flash drive that the defendant possessed while

23  they both lived in the very same house in Bay City that these

24  devices were recovered from in 2020.  She'll describe how it

25  happened on the defendant's birthday, how Holly was going to

1    help their two very young kids make birthday cards for the

2    defendant.  So she went into the defendant's room to retrieve

3    the craft supplies, but she found something that she thought

4    suspicious.

5             She found a hidden USB device, a flash drive.  She

6    took it, popped it into her computer and found a number of

7    images of child pornography.  Obviously this freaked her out,

8    but she looked through every single image to make sure that

9    none of their children were in those images.  Fortunately, they

10   weren't, but ultimately she went to the police, and you'll hear

11   that Mr. Zube admitted to another FBI agent that that incident

12   resulted in him being convicted of possessing child porn.

13            The defendant is charged here with a single count of

14   possessing or accessing with intent to view child pornography

15   involving a prepubescent minor, or a minor who had not attained

16   12 years of age.  This charge arises from the defendant's

17   possession of the devices and their content when police

18   executed the search warrant at his home in early 2020.

19            At the end of this trial, the judge will explain to

20   you the four elements of this offense:

21            First, that the defendant knowingly possessed child

22   pornography, or that he accessed with intent to view any

23   material that contained an image of child pornography.  Either

24   one is sufficient; that he possessed it, or that he accessed it

25   with intent to view.

1    Second, that the defendant knew that the material was
2 child -- that the material contained child pornography.

3    Third, that the child pornography involved a
4 prepubescent minor or a minor under 12 years of age.

5    And, finally, that the image was transported or
6 shipped using any means of interstate commerce, which includes
7 using a cell phone or the internet.

8    At the end of this case we're not here to decide why
9 the defendant chose to possess child pornography involving very
10 young girls, but we will answer the who; it's Justin Zube.  And
11 we will answer the what; that he knowingly possessed child
12 pornography that involved -- that it involved prepubescent
13 kids, kids under 12 years of age, and that it involved using
14 interstate commerce, his cell phone and the internet.

15    And that's why when you've heard all the evidence,
16 heard all the testimony and seen all the evidence, we will be
17 asking you to find Justin Zube guilty.  Thank you.

18    THE COURT:  Thank you, sir.

19    Mr. Rupp, do you wish to offer an opening statement
20 at this time.

21    MR. RUPP:  I do, Your Honor.

22    Good morning again, ladies and gentlemen.  If not
23 yesterday, certainly by the time we wrap up this trial you'll
24 feel inundated by terms like presumption of innocence, burden
25 of proof, and beyond a reasonable doubt.  And the reason you're

1   going to feel inundated by them is because we have to repeat

2   them over and over again because they're so important to our

3   criminal justice system.

4          You've heard Mr. Vailliencourt outline what he

5   anticipates the evidence to be, and he's asking you, if he's

6   able to present those things and prove those elements to you,

7   to find Mr. Zube guilty.

8          The flip side of that coin is, as the judge

9   indicated, nothing he said in his opening, nothing I'm saying

10  right now is evidence for you to consider.  These are simply

11  our comments and our predictions of what we expect the trial

12  will be.  If at the end of the day, the Government's completed

13  its case, presented its witnesses, its exhibits, and they

14  haven't proven each of the elements of the offense -- they have

15  to prove each and every one by beyond a reasonable doubt.  One

16  out of two, two out of three, three out of four isn't enough.

17  It has to be across the board all beyond a reasonable doubt.

18         So I simply ask that you listen to the evidence,

19  listen to the witnesses, consider the exhibits, consider things

20  you may not hear, and at the end of the day, if you've got a

21  reasonable doubt about any one of those elements, you need to

22  finds Mr. Zube not guilty.

23         And I would emphasize that looking at this case, the

24  verdict form's going to say not guilty or guilty.  Another way

25  to look at it is proven or not proven.  If they haven't proven

```
 1   their case, you should vote not guilty.  And rest assured that
 2   a not guilty verdict does not equate to your approval of the
 3   possession of child pornography.  Thank you.
 4            THE COURT:  Thank you, sir.
 5            The Government?
 6            MR. RUPP:  Judge, I apologize.  I think I've
 7   neglected to this point to move to sequester witnesses and I
 8   would do so at this time.
 9            MR. VAILLIENCOURT:  No objection.  Your Honor.
10            THE COURT:  Yes.  Were there any in particular that
11   were in the courtroom that were of concern to you, sir.
12            MR. RUPP:  No, Judge.  I don't believe anybody's been
13   in here, but I like to put it on the record just to be --
14            THE COURT:  Certainly.
15            MR. RUPP:  -- just to cover the base.
16            MR. VAILLIENCOURT:  Obviously that would exclude the
17   officer in charge.
18            THE COURT:  Yes.
19            Is the witnesses in Bay City?
20            MR. VAILLIENCOURT:  I'm sorry?
21            THE COURT:  Is the witness in Bay City?
22            MR. VAILLIENCOURT:  Our first witness?
23            THE COURT:  Shall we call a witness.
24            MS. NEE:  Absolutely.  Your Honor, the Government
25   calls as its first witness, Sergeant Evan Zapolski.
```

```
 1            THE COURT:  Excellent.
 2            Good morning, sir.  If you could stop for just a
 3   moment, raise your right hand.
 4            (At 9:11 a.m., witness sworn by court.)
 5            THE COURT:  Have a seat.  The chair itself does not
 6   move, but you can move the microphone.  Usually about 10 inches
 7   away from your mouth works best for amplification.
 8            THE WITNESS:  Okay.
 9            THE COURT:  Your witness.
10                     EVAN ZAPOLSKI,
11            GOVERNMENT'S WITNESS, SWORN AT 9:11 a.m.
12                    DIRECT EXAMINATION
13   BY MS. NEE:
14   Q.   Sergeant Zapolski, could you please give your name for the
15   audience, please, for the jury.
16   A.   Evan Zapolski.
17   Q.   And where do you work?
18   A.   The Michigan State Police.
19   Q.   What is your position there?
20   A.   I am a detective sergeant.
21   Q.   May I refer to you as Detective Zapolski?
22   A.   Yes.
23   Q.   How long have you been working for the Michigan State
24   Police?
25   A.   Since 2013.
```

Zapolski - Direct                                                    22

```
1   Q.   And prior to that, did you attend the Michigan State
2   Police training academy?
3   A.   Yes.
4   Q.   What year was that?
5   A.   Also 2013.
6   Q.   And prior to that, what were you doing?
7   A.   I just graduated from Michigan State University.
8   Q.   What was your degree?
9   A.   Criminal justice.
10  Q.   I'd like to talk now a little bit more about your
11  experience with the Michigan State Police since 2013.  What is
12  your current position?
13  A.   Detective sergeant of the computer crimes unit in
14  Bridgeport.
15  Q.   How long have you been in that role?
16  A.   I've been a detective sergeant since September '21.
17  Q.   What are some of your primary duties in that role?
18  A.   I supervise state and local detectives as well as civilian
19  computer examiners for child exploitation investigations as
20  well as general digital forensics.
21  Q.   And by general digital forensics, do you mean that you --
22  what do you do with respect --
23  A.   Our office is a -- it's sort of a dual office.  We do
24  proactive child exploitation investigations.  We also offer
25  digital forensic support to area law enforcement.
```

Zapolski – Direct                                                     23

```
 1   Q.   And in addition to supervising these types of
 2   investigations, do you also still do any of them yourself?
 3   A.   Yes.
 4   Q.   Prior to becoming the supervisor of that unit, what was
 5   your role?
 6   A.   I was a detective trooper assigned to the unit, as well as
 7   a task force officer for the FBI.
 8   Q.   Were you also during that time specifically a member of
 9   the Internet Crimes Against Children Task Force?
10   A.   Yes.
11   Q.   And what was your role during the time when you were
12   working in the computer crimes unit as part of the Internet
13   Crimes Against Children Task Force?
14   A.   As a detective within the Internet Crimes Against Children
15   Task Force we investigate child exploitation as it occurs on
16   the internet.
17   Q.   And what are some of the ways in which you investigate
18   those crimes?
19   A.   We receive cyber tips from the National Center for Missing
20   and Exploited Children.  We also do undercover chatting, as
21   well as some other types of child exploitation investigations.
22   Q.   Does this also involve -- you talked about digital
23   forensics or digital examinations?
24   A.   Yes.
25   Q.   You mentioned you were also on a task force with the FBI.
```

Zapolski – Direct                                            24

1   Was that the Northeast Michigan Trafficking and Exploitation
2   Crimes Task Force?
3   A.   Yes, it was.
4   Q.   How long were you a part of that task force approximately?
5   A.   About two years.
6   Q.   When did you first join the computer crimes unit with the
7   Michigan State Police?
8   A.   February of 2017.
9   Q.   So have you been with that unit since February of 2017 and
10  just in different roles?
11  A.   Yes.
12  Q.   And were you part of the FBI task force during that same
13  period?
14  A.   Yes.  I started with the FBI task force in March of 2019.
15  Q.   And prior to joining the Internet Crimes Against Children
16  Task Force and the computer crimes unit that you mentioned in
17  February of 2017, what was your position with the Michigan
18  State Police?
19  A.   I was a trooper assigned to the Tri-City post, a uniformed
20  trooper.
21  Q.   Between February 2017 and the present, during this time
22  that you've been part of the Internet Crimes Against Children
23  Task Force, approximately how many cases involving child
24  pornography or child exploitation would you say that you've
25  worked on?

Zapolski - Direct                                                    25

1  A.   Just worked on, it would be hundreds.

2  Q.   I'd like to direct your attention to some of the

3  background investigation in the current case.  Are you familiar

4  with an investigation of Mr. Justin Zube?

5  A.   Yes.

6  Q.   Were you what is commonly called a case agent or lead

7  agent for that case?

8  A.   Yes.

9  Q.   And what does that mean about your role with respect to

10  the case?

11  A.   I was the primary investigator.

12  Q.   Do you see Mr. Justin Zube in the courtroom here today?

13  A.   Yes.

14  Q.   And could you identify him by some clothing?

15  A.   He's wearing the blue shirt, short sleeved.

16        MS. NEE:  The Government requests that the record

17  reflect that Detective Zapolski has identified the defendant.

18        THE COURT:  Witness has identified the defendant.

19  BY MS. NEE:

20  Q.   Detective Zapolski, could you give some background on how

21  you received this case?

22  A.   Yes.  This case was a cyber tip from the National Center

23  for Missing and Exploited Children.

24  Q.   And what is the National Center for Missing and Exploited

25  Children?

Zapolski – Direct                                              26

1   A.   It is a national clearinghouse for electronic service

2   providers like Facebook, Snapchat and Google to report

3   instances of child exploitation occurring on their services.

4   They also have a number of services in regards to missing

5   children.

6   Q.   And these types of child exploitation that these

7   electronic service providers like Facebook, Snapchat, Google,

8   the types of child exploitation that they provide tips about,

9   what kinds of tips are those, or what sorts of conduct are they

10  providing tips about?

11  A.   They will report any instance of child exploitation

12  occurring so if, for instance, a user is receiving child

13  pornography, sending child pornography or just storing child

14  pornography, a tip will be submitted by that company.

15  Q.   And here was there a cyber tip that was received by your

16  office that originated with a cyber tip that was given to the

17  National Center for Missing and Exploited Children?

18  A.   Yes.

19  Q.   And what service provider was involved with that tip?

20  A.   Snapchat.

21  Q.   Could you provide some basic information about what that

22  tip stated?

23  A.   Yes.  It reported a user account, s4s2019clean was the

24  username because it was associated with child pornography.

25  Q.   And did that cyber tip provide any other information about

Zapolski – Direct                                                    27

1   that account, s4s2019clean?

2   A.   Yes.  It provided an email address, s4s2019clean@gmail, as

3   well as an IP address used by the account.

4   Q.   And you said that this cyber tip came from Snapchat.  Can

5   you tell us what Snapchat is.

6   A.    It is a mobile multimedia messaging application which

7   allows users to send pictures and videos as well as texts in

8   private one-on-one message threads, as well as group chat

9   threads.

10  Q.   And what are some of the things that you need in order to

11  access Snapchat?

12  A.   Either a cell phone, a tablet and also the internet.

13  Q.   And what did Snapchat say in its tip with respect to why

14  it was providing a tip to the National Center for Missing and

15  Exploited Children?

16           MR. RUPP:  I'm going to object as to hearsay.

17           THE COURT:  Overruled.

18           THE WITNESS:  The tip provided the child pornography

19  files associated with the account.  The words "chat media" were

20  within the file names for the child pornography, so this

21  account either sent or received these files of child

22  pornography.

23  BY MS. NEE:

24  Q.   And did you review the files that you received?

25  A.   Yes.

28

1   Q.   Did they appear to contain, in your opinion, images of

2   child pornography based on your experience in these

3   investigations?

4   A.   Yes.

5   Q.   Did Snapchat provide information regarding IP address

6   information with this account?

7   A.   Yes.

8   Q.   What is IP -- an IP address?

9   A.   It's a numerical value assigned to a computer or a router

10  which basically allows that device to communicate with the

11  internet.

12  Q.   And does an IP address function for cell phones and other

13  devices in the same way kind of like a street address does?

14  A.   Somewhat similar.

15  Q.   Does an IP address allow you to have any investigative

16  leads about who might be using that particular IP address?

17  A.   Yes.

18  Q.   And how do you investigate when you receive an IP address?

19  A.   We determine the internet service provider that maintains

20  that IP address, and we provide that internet service provider

21  with legal process, a search warrant or a subpoena, to provide

22  the subscriber information of the person that was assigned that

23  IP address.

24  Q.   And in this case, was subscriber information obtained with

25  respect to the IP address that was included with the Snapchat

1   tip?

2   A.   Yes.

3   Q.   What information was obtained about the subscriber for

4   that particular IP address that was included with the cyber

5   tip?

6   A.   It was determined to be a Sprint IP address, and Sprint

7   provided the name as well as the billing address and the phone

8   number for the subscriber.

9   Q.   And do you recall what that information was?

10  A.   Yes.   The name on the account was Justin William.   The

11  billing address was 118 South Lincoln Street in Bay City, and

12  the phone number (989)443-0206.

13  Q.   Did you run any other queries to follow-up on that address

14  which was included with the information from Sprint about 118

15  South Lincoln Street?

16  A.   Yes.   I checked the Law Enforcement Intelligence Network

17  to determine the registered occupants of that address.

18  Q.   Who were the registered occupants of that address?

19  A.   Justin William Zube and Randy Zube.

20  Q.   And what is Randy Zube's relationship to Justin William

21  Zube based on your investigation?

22  A.   He is his father.

23  Q.   You testified there was a phone number associated with the

24  subscriber account that you received from Sprint in relation to

25  the IP address and the cyber tip and that that phone number was

1    (989)443-0206; is that correct?

2    A.    Yes.

3    Q.    And during the course of the investigation, did you

4    determine whose phone number that was?

5    A.    Yes.

6    Q.    Whose phone number was that?

7    A.    Justin Zube's.

8    Q.    How did you determine that that was Justin Zube's

9    telephone number?

10   A.    That phone number was discovered to be associated with

11   several of the cell phones seized from his bedroom.  It was

12   also used by Mr. Zube to communicate with Special Agent Doug

13   Smith after the execution of the search warrant, and Holly

14   Elliott also provided that phone number as Justin Zube's phone

15   number.

16   Q.    And just to clarify, did you say it was used to

17   communicate with Doug Smith at the search warrant or --

18   A.    No, it was after the search warrant.

19   Q.    After.  Thank you.

20          After finding out this information, what did you do

21   next in your investigation?

22   A.    I obtained a search warrant for 118 South Lincoln Street.

23   Q.    In Bay City?

24   A.    Yes.

25   Q.    Could you briefly describe for us in general what you have

1  to do in order to get a search warrant?

2  A.   We, rather I, drafted a document, a sworn statement called

3  an affidavit which --

4         MR. RUPP:   I'm going to object as to the relevance of

5  what the legal process of obtaining a warrant is.

6         THE COURT:   Overruled.

7         THE WITNESS:   I -- so we draft a statement called an

8  affidavit which contains the -- some of the case facts as well

9  as what we expect to find at a specific residence as it relates

10 to the case.

11 BY MS. NEE:

12 Q.   And then what do you do with that document that write?

13 A.   The document is then provided to a judge to determine if

14 there's enough evidence to authorize the search warrant.

15 Q.   In this particular case, did you follow that general

16 procedure?

17 A.   Yes.

18 Q.   And did you obtain a search warrant that was authorized by

19 a judge?

20 A.   Yes.

21 Q.   What was the location that you were authorized to search

22 in that search warrant?

23 A.   118 South Lincoln Street, Bay City.

24 Q.   Is that a location in the Eastern District of Michigan in

25 the Northern Division?

Zapolski - Direct

```
 1   A.    Yes.
 2   Q.    And what did the search warrant authorize you to search
 3   for?
 4   A.    Child pornography as well as computers and cell phones.
 5   Q.    Did it authorize any searches with respect to the -- to
 6   any computers and cell phones that you might find?
 7   A.    Yes.  It allowed for the search of the data within those
 8   devices as well.
 9   Q.    Did it also allow you to search for any other information
10   related to the device or the residence?
11   A.    Can you ask that again?
12   Q.    I'm sorry.  Did it allow you to search for any other
13   information regarding the devices and the residence, such as
14   use?
15   A.    I'm not sure.
16   Q.    Were you able to also look for information regarding who
17   resided at that residence for instance?
18   A.    Yes.  We were allowed to look for proof of residency of
19   who lived at the address.
20   Q.    And with respect to any electronic devices, were you
21   allowed to look for similar information?
22   A.    Yes.
23   Q.    Was the search warrant that you obtained executed or
24   carried out?
25   A.    Yes.
```

Zapolski – Direct                                                      33

1    Q.    When did that occur?

2    A.    February 11th, 2020.

3    Q.    Approximately what time did the search warrant -- did you

4    go to execute the search warrant?

5    A.    About 7:00 a.m.

6    Q.    Was there anybody at home at that time at 118 South

7    Lincoln Street?

8    A.    Yes.

9    Q.    Who was home?

10   A.    Justin and Randy Zube.

11   Q.    Were you part of that search?

12   A.    Yes.

13   Q.    And were there other law enforcement officers as well part

14   of that search?

15   A.    Yes.

16   Q.    Could you briefly describe how -- when you're going to

17   execute a search at a residence, how you prepare to execute

18   such a search?

19   A.    We initially have a briefing where we assign roles to each

20   person that's going to be assisting with the execution of the

21   search warrant.  We also provide some case details and also

22   some contingency plans in case somebody gets hurt.

23   Q.    Did you do that sort of initial preparation in this

24   particular case?

25   A.    Yes.

Zapolski – Direct

1  Q.   And what are some of the roles that you assign when you're

2  preparing for a search warrant?

3  A.   We typically assign roles such as the entry team into the

4  residence, the person taking photographs, the person conducting

5  the scene sketch, the person that's going to be handling the

6  evidence.

7  Q.   And in this case, who was the individual who was assigned

8  to take photographs?

9  A.   Detective Sergeant Bryan Byarski of the Grand Blanc Police

10 Department.

11 Q.   If you could for us then also briefly describe the steps

12 that you take when you actually go to execute the search

13 warrant at a residence?

14 A.   In general, when we get to a residence, we will have a

15 marked patrol unit there, just a vehicle that says "police"

16 that also has lights.  That vehicle will be used to make

17 announcements over the PA system, essentially "police, search

18 warrant," so the occupants know that it's the police at the

19 residence.

20         We will then knock on the door, announce presence,

21 and we will either wait for the person to answer the door or

22 make entry into the house.

23         The house will be secured.  Everybody who's in the

24 house will be congregated into a certain area of the house to

25 make the house safe.  The house will then be searched for

1  evidence.

2  Q.   Did you follow those general procedures in this particular

3  case for the search of 118 South Lincoln Street in Bay City on

4  February 11th of 2020?

5  A.   Yes.

6  Q.   Can you walk us through what happened first that morning.

7  A.   We arrived at the residence at about 7:00 a.m.  There was

8  a uniformed trooper with us.  He activated his lights on his

9  patrol vehicle and made announcements over his PA system,

10 "police, search warrant."  The emergency support team actually

11 executed the search warrant.  They breached the front door.

12 Q.   You indicated previously that the defendant, Justin Zube,

13 and Mr. Randy Zube were in the home at the time, that's

14 correct?

15 A.   Correct.

16 Q.   And where was Justin Zube located?

17 A.   He was located in a hallway coming towards the front door.

18 Q.   And where was Randy Zube located?

19 A.   He was in the detached garage.

20 Q.   Were there photographs taken of the house as well, as you

21 indicated, by Detective Sergeant Bryan Byarski in this case?

22 A.   Yes.

23 Q.   For procedures in terms of conducting the search, do

24 police take any steps in order to identify different rooms

25 within the house?

1  A.    Yes.  We have laminated placards with letters, and we tape

2  those up within the house to designate certain rooms as certain

3  letters.

4  Q.    And did you do that with respect to this search?

5  A.    Yes.

6  Q.    Was there a number associated with a room that you

7  determined to be Justin Zube's room?

8  A.    Yes.

9  Q.    And what letter was that?

10 A.    That was the letter D.

11 Q.    Did you, yourself, also go into Mr. Justin Zube's room at

12 some point in time during the search that day?

13 A.    Yes.

14 Q.    Did Mr. Justin Zube -- was he wearing shoes at the time

15 when law enforcement arrived?

16 A.    No.

17 Q.    And did you ask him where his shoes were?

18 A.    Yes, I did.

19 Q.    What did Mr. Zube say in response?

20 A.    He indicated that they were in his room.

21 Q.    Did he ask you for anything else in his room?

22 A.    He asked me to retrieve his house keys from his room.  He

23 said that they were on top of the stereo.

24 Q.    Did you obtain his house keys from that location?

25 A.    Yes.

1  Q.   And which room was that location?

2  A.   Room D.

3            MS. NEE:  Your Honor, may I approach?

4            THE COURT:  You may.

5  BY MS. NEE:

6  Q.   I'm handing you exhibits which are marked as Exhibit 1A,

7  1B, 1C, 1D, 1D-1 1E, 1E-1, and 1M.

8            Detective Zapolski, could you please look at the

9  exhibits that were marked as I previously referenced, and do

10 you recognize these exhibits?

11 A.   Yes.

12 Q.   What are they?

13 A.   This is Room D of 118 South Lincoln Street and some of

14 these pictures also depict the cell phones that were seized

15 from this room.

16 Q.   Are those photographs a true and accurate depiction of

17 Justin Zube's room at 118 South Lincoln Street on the day of

18 the search?

19 A.   Yes.

20            MS. NEE:  Your Honor, I move to admit these exhibits.

21            THE COURT:  Any objections, Mr. Rupp?

22            MR. RUPP:  No, Your Honor.

23            THE COURT:  The exhibits are received into evidence.

24 BY MS. NEE:

25 Q.   I'd like to now show Exhibit 1A.

Zapolski – Direct                                                    38

```
 1              THE COURT:  And if we can stop for just a moment, for
 2   the folks that are in the first row in the jury box, those
 3   monitors can be lifted.  I appreciate you doing it gently.
 4   That will enable the folks in the back of the jury box to be
 5   able to see the monitors more carefully.
 6              You may continue, ma'am.
 7   BY MS. NEE:
 8   Q.   We have on the screen here Exhibit 1A.  Detective
 9   Zapolski, could you tell us what this is showing.
10   A.   This is showing one of the entryways into Room D, as well
11   as the letter D placard.
12   Q.   And so Room D, you said this is the entryway into Room D,
13   meaning that Room D is in the area of the photographs that's
14   behind the placard?
15   A.   Yes.
16   Q.   And are you able to make out any of the features of what's
17   inside of the room of Room D from this general picture from the
18   doorway?
19   A.   Yes.  I can see the -- there's a pink blanket.  It appears
20   on the wall as well as the end of the bed.
21   Q.   I'd like to move to Exhibit 1B.  What is this picture
22   depicting?
23   A.   This is the bed within Room D.
24   Q.   And are there other aspects of the furniture in this room
25   that you could describe for us?
```

1  A.   Yes.  Again, the bed is visible, the pink blanket on the

2  wall, there's a dresser near the right side of the image.

3  Q.   Is there something that appears to be the back of some

4  sort of monitor or television in the front?

5  A.   Yes.  At the bottom of the image there appears to be the

6  back side of a TV.

7  Q.   With respect to the objects on the bed, what can generally

8  be seen there?

9  A.   There's a cell phone visible on the bed.

10 Q.   And is there some identifying information about the items

11 next to the cell phone on the bed, such as a description of the

12 blankets?

13 A.   Yes.  There's a -- the cell phone is on a beige-colored

14 blanket.  There's also a red, white and blue blanket near the

15 phone.

16 Q.   I'd like to move now to Exhibit 1C.  What is this?

17 A.   Near the left side of the picture, the bed is visible as

18 well as that cell phone.  The dresser is visible.  The TV is

19 visible near the right side of the picture.  Near the top of

20 the picture, there's a yellow blue and red basket on top of the

21 dresser.

22 Q.   Did there appear to be some items on the floor as well,

23 next to the bed?

24 A.   Yes.  There are at least three shoe boxes visible, and

25 there are at least four cell phones visible on the floor.

1   Q.   I'd like to move now to Exhibit 1D, and what is this

2   picture showing?

3   A.   This picture shows on the very far left the cell phone on

4   the bed.  In the center of the picture there are four cell

5   phones on the ground next to that red shoe box.

6   Q.   I'd like to show now Exhibit 1D1, and what is this showing

7   here?

8   A.   This is an LG cell phone that was on the ground next to

9   the bed and the shoe box.

10  Q.   Did you eventually during the investigation search this

11  phone?

12  A.   Yes.

13  Q.   Did you find evidence relevant to the case on this phone?

14  A.   I did.

15  Q.   I'd like to move now to Exhibit 1E.  What is this picture

16  showing?

17  A.   This pictures shows the cell phone that is on the bed.

18  Q.   Can we please look at Exhibit 1E-1.  What is this?

19  A.   This is a closeup of that same phone that's on the bed.

20  Q.   Did you at some point in the investigation search this

21  phone?

22  A.   Yes.

23  Q.   And did you find relevant evidence on this phone?

24  A.   Yes, I did.

25  Q.   Moving to Exhibit 1F -- or, excuse me, 1M.  What are we

Zapolski – Direct                                        41

1   looking at here?

2   A.   This is another entryway into Room D.  This picture was

3   taken from the kitchen looking into Room D.

4   Q.   And are you able to identify any furniture in here inside

5   of the room that's Room D?

6   A.   Yes.  Again, you can see the bed within the room as well

7   as the dresser.

8   Q.   Thank you.  I think we're done with the exhibits there.

9        Did police seize items from inside of Mr. Zube's room

10  in the house at 118 South Lincoln Street during the search?

11  A.   Yes.

12  Q.   What devices did they seize?

13  A.   Thirteen cell phones, a clear electronic device, a laptop,

14  and two SD cards.

15  Q.   Was there also an additional SD card that was found so for

16  three total?

17  A.   Yes, I believe so.

18  Q.   Why were these types of items seized?

19  A.   They can store child pornography as well as run the

20  Snapchat application.

21  Q.   I'm now going to hand you some additional exhibits, if I

22  may approach again, Your Honor?

23        THE COURT:  You may.

24  BY MS. NEE:

25  Q.   I'm now handing you what's been marked as Exhibit 1F, 1G,

1    1H, 1I, 1I-1, 1J, 1K, and 1L.

2              Detective Zapolski, do you recognize these?

3    A.    Yes, I do.

4    Q.    What are these?

5    A.    These are additional pictures taken from 118 South Lincoln

6    Street.

7    Q.    And could we look at Exhibit 1F, please.  What is this

8    showing?

9    A.    This shows a laptop on top of the yellow, blue and red

10   basket that was on the dresser within Room D.

11   Q.    Could we see Exhibit 1G, please?  What is this?

12   A.    This is a PlayStation and an X-Box that was within Room D.

13   Q.    And where is this located relative to the rest of the

14   room?

15   A.    This would be near an entryway and the closet.

16   Q.    Could we see Exhibit 1I, please.  What is this?

17   A.    This picture depicts the top left dresser drawer that is

18   directly next to the bed within Room D.

19   Q.    And the top left dresser drawer, where's that located

20   relative to the bed?

21   A.    Directly next to the bed.

22   Q.    Could we see Exhibit 1I-1, please.  What is this?

23   A.    This is the cell phone that was located within that top

24   dresser drawer.

25   Q.    Did you at some point in time search this phone?

1  A.   Yes.

2  Q.   Did you find relevant evidence on it?

3  A.   Yes.

4  Q.   Exhibit 1J, please.  What is this?

5  A.   This is one of the shoe boxes that was on the floor within

6  Room D.

7  Q.   And can you make out the furniture that's on the top part

8  of that picture behind the shoe box?

9  A.   Yes.  Near the top of the picture is the dresser within

10 Room D.

11 Q.   1K, please.  What is this?

12 A.   This is a plastic baggie located on the ground next to the

13 bed within Room D.

14 Q.   Did you -- did police seize evidence from within that bag?

15 A.   Yes.  The micro SD cards were in this bag.

16 Q.   Exhibit 1L, please.  What is this?

17 A.   This is the -- an up-close picture of the placard for Room

18 D.

19 Q.   Could I also see Exhibit 1H, please.  What is that?

20 A.   This is a letter addressed to Justin Zube at 118 South

21 Lincoln Street, Bay City.

22 Q.   And were these all photographs that were taken during the

23 search of 118 South Lincoln Street in Bay City on the day of

24 the search that we've discussed?

25 A.   Yes.

1   Q.   We're done with these exhibits.

2            You indicated that police seized some evidence from

3   Mr. Zube's room in Room D that day during the search.  What was

4   the procedure for seizing the evidence in this case?

5   A.   Once the devices were located, the photographer, Detective

6   Sergeant Bryan Byarski was called to take a photograph of that

7   evidence.  The evidence was then moved from the location it was

8   discovered into the kitchen area where we had our evidence

9   collection site set up.

10  Q.   And what happened to the evidence at that point?

11  A.   It was placed into evidence bags.

12  Q.   And then what happened to the evidence?

13  A.   After the evidence was all collected from the residence

14  and sealed into their evidence bags, I took custody of those.

15  Q.   What did you do with them after you took custody of them?

16  A.   I brought them back to my office in Bridgeport.

17  Q.   And what did you do with them there?

18  A.   They were logged into our report writing system and a

19  property label was generated.

20  Q.   Was the property label placed on the exhibit then or on

21  the evidence item?

22  A.   Yes, it was affixed to the plastic bag.

23  Q.   Then what was done with the evidence items?

24  A.   They were stored in the property room at my office.

25  Q.   Are there any special procedures to access the property

Zapolski – Direct                                        45

 1  room in your office?

 2  A.    Yes.

 3  Q.    What are those?

 4  A.    In order to access the property room there's a locked knob

 5  that's a mechanical lock that only members of my office have.

 6  If an evidence item needs to come out of the property room, a

 7  journal entry is made within our report writing system that

 8  notes that the property is coming out, and when it goes back

 9  in, same thing.  There's a property journal that gets created

10  when it goes back into the property room.

11  Q.    At some point, were some of the items of evidence in this

12  case transferred to the custody of another law enforcement

13  agency?

14  A.    Yes.

15  Q.    And what was that?

16  A.    The property was turned over to Special Agent Smith in

17  March of 2020 for analysis.

18  Q.    Turned over to the FBI?

19  A.    Yes.

20  Q.    And did you receive the items back from the FBI at some

21  point in time?

22  A.    Yes.

23  Q.    And approximately when was that?

24  A.    August of 2020.

25  Q.    For purposes of this trial, did you focus your attention

Zapolski – Direct                                                     46

1  on some specific items of evidence?

2  A.    Yes.

3  Q.    Which items were these?

4  A.    The cell phone located on the bed, which was a Coolpad,

5  one of the cell phones located on the ground next to the bed

6  and the shoe box, as well as the cell phone located in the top

7  dresser drawer.

8           MS. NEE:  Your Honor, if I may approach again.

9           THE COURT:  You may.

10 BY MS. NEE:

11 Q.    I'm now handing you what has been marked as Exhibit 2A, 3A

12 and 4A.

13          THE COURT:  Ms. Nee, will you be moving the last

14 series of exhibits you took testimony on into evidence?

15          MS. NEE:  We will be doing that with our next

16 witness, Your Honor.

17          THE COURT:  Okay.

18 BY MS. NEE:

19 Q.    Let's start with Exhibit 2A.  Do you recognize this item?

20 A.    I do.

21 Q.    How are you able to recognize it?

22 A.    This is the Coolpad that was located on the bed within

23 Room D.  I'm able to recognize it because it has distinct

24 button combinations on one of the sides as well as speakers on

25 the bottom near the charging part.

Zapolski – Direct                                                      47

1  Q.    And are there also any labels on the plastic bag which

2  enable you to identify this?

3  A.    Yes.   There's also my property label that I generated on

4  this plastic bag.

5  Q.    And you indicated some identifying features of this

6  Coolpad.   Were you able to see those also in any of those

7  search warrant pictures that were taken?

8  A.    Yes.

9  Q.    And you indicated that this was the item that was seized

10  from the bed, from Justin Zube's bed?

11  A.    Yes.

12  Q.    Was this evidence kept as evidence according to the

13  procedures that you described earlier?

14  A.    Yes.

15  Q.    And is it now in substantially the same condition as when

16  you first saw it?

17  A.    Yes.

18          MS. NEE:   Your Honor, I'd move to admit Exhibit 2A.

19          MR. RUPP:   No objection.

20          THE COURT:   2A is received.

21  BY MS. NEE:

22  Q.    I'd like now to move to Exhibit 3A.   Do you recognize this

23  item?

24  A.    I do.

25  Q.    And how are you able to recognize that?

Zapolski - Direct                                                    48

1   A.   It has the property label that I generated for it on the

2   bag.

3   Q.   What is this exhibit?

4   A.   This is the cellphone that was located on the floor next

5   to the bed and the shoe box.

6   Q.   And were you able to compare this item to search warrant

7   photographs that were taken on the day of the search?

8   A.   Yes.

9   Q.   And did this item appear to resemble any of the search

10  warrant photo items?

11  A.   Yes.

12  Q.   Was that item that it resembled the Exhibit 1D-1 that we

13  showed earlier, that was the expanded view of a phone that was

14  on the floor next to the bed?

15  A.   Yes.

16  Q.   Was this item kept as evidence using the procedures that

17  you described earlier?

18  A.   Yes, it was.

19  Q.   And is it in substantially the same condition now as when

20  you first saw it?

21  A.   Yes.

22        MS. NEE:  Your Honor, I'd also move to admit

23  Exhibit 3A.

24        THE COURT:  Any objection to 3A?

25        MR. RUPP:  No, Your Honor.

1          THE COURT:  Received.

2    BY MS. NEE:

3    Q.   Moving to Exhibit 4A, do you recognize this?

4    A.   Yes, I do.

5    Q.   How are you able to recognize this?

6    A.   It has the property label that I generated for it affixed

7    to the bag.

8    Q.   What is it?

9    A.   This is an LG cell phone.

10   Q.   And where was this seized from?

11   A.   This was located in the top dresser drawer located next to

12   the bed within Room D.

13   Q.   Were you able to compare this item against the search

14   warrant photographs?

15   A.   Yes.

16   Q.   And did the item appear to be the same item that you saw

17   in the search warrant photograph?

18   A.   Yes.

19   Q.   Specifically was this the item in Exhibit 1I and 1I-1 that

20   we saw a zoomed-in picture of earlier?

21   A.   Yes.

22   Q.   Was this item kept as evidence using the procedures that

23   you described earlier?

24   A.   Yes.

25   Q.   And is it in substantially the same condition now as when

1  you first saw it?

2  A.   Yes, it was.

3          MS. NEE:  Your Honor, I'd also move to admit

4  Exhibit 4A.

5          THE COURT:  Any objections to 4A?

6          MR. RUPP:  No, Your Honor.

7          THE COURT:  Received.

8          MS. NEE:  Your Honor, I'd also like permission to

9  publish these exhibits to the jury by handing it to them and

10  allowing them to pass them around.

11          THE COURT:  Yes.

12          MS. NEE:  May I approach?

13          THE COURT:  You may do so.

14  BY MS. NEE:

15  Q.   You mentioned that Exhibit 2A was a Coolpad cellular

16  phone; is that correct?

17  A.   Yes.

18  Q.   Were there any other Coolpad cellular phones seized that

19  day?

20  A.   No.

21  Q.   You also indicated that you had an opportunity to search

22  these three phones; is that correct?

23  A.   Yes.

24  Q.   Was this pursuant to the same search warrant that you

25  described previously?

1  A.    Yes.

2  Q.    Did you conduct a forensic examination of these phones?

3  A.    Yes, I did.

4  Q.    And did you also create reports?

5  A.    Yes, I did.

6  Q.    And did these reports reflect the results of your

7  examination?

8  A.    Yes.

9          MS. NEE:  At this point, the Government has concluded

10 its initial examination of this witness but will recall the

11 witness later for additional testimony, and the witness will

12 now be tendered for cross-examination.

13         THE COURT:  Cross.

14         MR. RUPP:  Should I use the podium or --

15         THE COURT:  Whatever your preference is, sir.

16                     CROSS-EXAMINATION

17 BY MR. RUPP:

18 Q.    Good morning, Detective.

19 A.    Good morning.

20 Q.    When this investigation began, it was initiated from a tip

21 from Snapchat, correct?

22 A.    Yes, sir.

23 Q.    And initially the investigation began in Ohio?

24 A.    It was initially sent to Ohio, yes.

25 Q.    That was because there was some aspect of the tip or the

1  account associated with it was geolocated to Ohio; is that
2  correct?
3  A.    Yes.
4  Q.    What does geolocation mean, or what does it mean to be
5  geolocated?
6  A.    IP addresses can be geolocated.  It's not 100 percent
7  accurate as to the location of the activity, especially with
8  mobile devices.  When it's a residential IP address, the
9  geolocation is typically more accurate.  However, with mobile
10 IP addresses like Sprint, Verizon the geolocation is rarely,
11 correct.
12 Q.    There isn't any aspect of your investigation that puts
13 Mr. Zube in Ohio at any relevant time period there?
14 A.    No, correct.
15 Q.    As far as the various devices that were located in Room D,
16 you don't have any personal information about how those devices
17 got to be in the room, do you, when you conducted your search
18 warrant, correct?
19 A.    Correct.
20 Q.    You don't have any personal knowledge about who put
21 those --
22 A.    That's correct.
23 Q.    You don't have any personal knowledge about who or rather
24 how many people might have had access to those devices, do you?
25 A.    Correct.

```
 1  Q.    And with regard to executing the search warrant, you
 2  indicated that when law enforcement went into the home,
 3  Mr. Zube was found in the hallway.  I think you described him
 4  as approaching the door?
 5  A.    Yes.
 6  Q.    Approaching the same door that a breach was made?
 7  A.    Yes.
 8  Q.    Breach was made after or contemporaneous with an
 9  announcement from some others officer in a patrol vehicle?
10  A.    Yes.
11  Q.    Was there any physical knock on the door that you're aware
12  of?
13  A.    That I don't know.  I was near the back of the residence
14  securing the detached garage.
15          THE COURT:  Mr. Rupp, could you move that microphone
16  up a little bit better, I think we could use a little more
17  amplification, please.
18          MR. RUPP:  The previous user was too short.
19  BY MR. RUPP:
20  Q.    So, now, if I understood you correctly, Detective, you
21  seized 13 phones, a laptop, three SD cards, and was there
22  anything else that was taken?
23  A.    There was a clear plastic device that was also taken and
24  had a screen on it.
25  Q.    Your focus was on the three devices in particular that --
```

1  where we have the physical exhibits that have been admitted?

2  A.   I conducted the analysis of those three as well as several

3  others.

4  Q.   Your analysis, you don't have any information about

5  alleged child pornography being found on the majority of the

6  other devices that were seized?

7  A.   Can you ask that again, I'm sorry?

8  Q.   You seized approximately I think 18 different items.  You

9  focused your search on three of them, so the majority of the

10  items that were seized, you did not analyze or find alleged

11  pornography on, correct?

12  A.   Correct.

13          MR. RUPP:  If I could have just a moment, Your Honor.

14          THE COURT:  Yes, sir.

15          MR. RUPP:  I have no further questions.  Thank you.

16          THE COURT:  Thank you.

17          The witness may step down, and if the Government

18  would like to identify your next witness, please.

19          MS. NEE:  I just have a few redirect questions if I

20  may, Your Honor, first, and then we'll call our next witness.

21                     REDIRECT EXAMINATION

22  BY MS. NEE:

23  Q.   Briefly, to discuss the accuracy of the IP address, you

24  had indicated that there's IP addresses associated with cell

25  phones and IP addresses associated with residences.  Could you

1    just explain a little bit more about that and why there might

2    be some differences in how those IP addresses are geolocated?

3    A.   So residential IP addresses are inherently going to be one

4    location, because they're assigned to a router within a

5    residence or a business.

6              Mobile IP addresses are assigned to a specific phone

7    account, and when an IP address is used by a phone, the actual

8    location of the person isn't recorded by the company just by

9    the IP address alone.

10   Q.   And in this particular case, you testified previously that

11   you sought additional information about that IP address

12   directly from the provider; is that correct?

13   A.   Can you ask that again?

14   Q.   In this particular case, you testified previously that you

15   sought additional information from the service provider for

16   that IP address; is that correct?

17   A.   Yes.

18   Q.   And that service provider did provide you with the

19   specific phone account subscriber information related to that

20   IP address?

21   A.   Yes.

22   Q.   And that's how you obtained the physical address that was

23   associated with that user?

24   A.   Yes.

25   Q.   As well as his name and his phone number?

Zapolski – Redirect                                              56

1  A.    Yes.

2  Q.    In that case, that was, as you testified earlier, related

3  to Mr. Justin Zube and the house that was searched?

4  A.    Yes.

5  Q.    Just to also clarify the point regarding the devices that

6  were seized and searched, defense counsel asked you about your

7  focus on the three particular phones that we admitted into

8  evidence, is that -- do you remember that?

9  A.    Yes.

10 Q.    Were the rest of the devices, to the extent that they were

11 able to be accessed, actually analyzed?

12 A.    Yes, they were.

13 Q.    And why was your -- when we talk about your focus being on

14 these three particular items, why -- why was your, why did your

15 focus become these three particular items?

16 A.    Because they contained evidence.

17 Q.    And when you say "evidence," is that evidence relevant of

18 the crime that's being charged here?

19 A.    Yes.

20        MS. NEE:  No further questions.

21        THE COURT:  Mr. Rupp I'm assuming no additional

22 cross?

23        MR. RUPP:  Correct, Your Honor.  Thank you.

24        THE COURT:  Thank you.  You can step down, sir.

25        (At 10:01 a.m., witness excused.)

 1          MS. NEE:  The Government will call Sergeant Bryan

 2  Byarski next.

 3          THE COURT:  Good morning.

 4          MR. BYARSKI:  Good morning, Your Honor.

 5          THE COURT:  If you could stop for just a moment raise

 6  your right hand.

 7          (At 10:02, witness sworn by the Court.)

 8          THE COURT:  As we will be noting to each of the

 9  witnesses, the chair does not move, however, the microphone

10  does, and about 10 inches seems to be the best amplification.

11          Your witness, Ms. Nee.

12          MS. NEE:  Thank you.

13                      BRYAN BYARSKI,

14          GOVERNMENT'S WITNESS, SWORN AT 10:02 a.m.

15                     DIRECT EXAMINATION

16  BY MS. NEE:

17  Q.   Could you please state your name for the record.

18  A.   Yes, Bryan Byarski.

19  Q.   Where are you currently employed?

20  A.   I'm a detective sergeant with the City of Grand Blanc

21  Police Department.

22  Q.   How long have you been employed in that way?

23  A.   Twenty-five years.

24  Q.   What is your current rank or position?

25  A.   I'm a detective sergeant.

1  Q.    During your 25 years with the City of Grand Blanc Police

2  Department, what types of roles have you held?

3  A.    Like most officers, I started out as a patrolman; worked

4  as a patrolman for several years; did a few years in a rotating

5  spot in the detective bureau handling criminal cases there; was

6  promoted to sergeant; went back to the road as a patrol

7  sergeant; and then moved to my current position as a detective

8  sergeant.

9  Q.    And do you work with particular types of crimes now?

10  A.    We are a smaller department, so we handle -- we handle

11  pretty much everything.  We do anything from a shoplifter to a

12  homicide.  We do it all, so --

13  Q.    And does part of your work also involve working on

14  internet crimes?

15  A.    It does.  I was sent in 2016 down to the National Forensic

16  Center with the Secret Service, was trained as a mobile device

17  examiner.  As a result of that training, I was asked to become

18  an affiliate with the Michigan State Police Computer Crimes

19  Unit and the Internet Crimes Against Children Task Force.

20  Q.    And as part of that role, did you participate in search

21  warrant executions, for instance, with other members of the

22  Internet Crimes Against Children Task Force or the computer

23  crimes unit?

24  A.    Yes, that was one of the main roles that we did there was,

25  again, investigating those crimes and conducting search

1   warrants as a result.

2   Q.   On February 11th of 2020, did you participate in a search

3   warrant at a residence at 118 South Lincoln Street in Bay City

4   in Michigan?

5   A.   I did.

6   Q.   What was your role in that search that day?

7   A.   I was assigned to take photographs that day.

8   Q.   Is this a role that you've had in other searches?

9   A.   It is, just depending on the manpower we have at the

10  different search warrants.  The officer in charge would assign

11  different tasks for the members there.

12  Q.   So being the photographer in the photographer role is

13  something that you've done a number of times though in the

14  past?

15  A.   I have.

16  Q.   And what do you understand as the role of being the

17  photographer at a search warrant?

18  A.   Our basic function as a photographer is just to kind of

19  memorialize the whole scene, so I would normally start outside

20  of the residence to capture the full residence, get a picture

21  of the address to, again, assure that we are at the correct

22  place that is listed on the search warrant.

23  Q.   And do you understand part of your role in memorializing

24  the scene is to be able to take pictures both before and after

25  and during the search is happening?

1  A.   Correct.  We would -- again, we'd start kind of big and

2  work our way down to the smaller rooms.  We'd do initial

3  photography.  Normally I'd start outside because inside they

4  would be labeling the different rooms with letters to

5  distinguish the different rooms.

6           So I would start outside, work in, do a pre-search

7  photograph to photograph everything that is as it is when we

8  got there.  And then once all the pre-photos were done they

9  would start searching.

10           During the search, if somebody found a piece of

11  evidence that they thought needed to be seized, they would

12  request I come over and take a picture of that evidence before

13  it was seized.

14           MS. NEE:  Your Honor, may I approach?

15           THE COURT:  You may.

16  BY MS. NEE:

17  Q.   I'm now handing you what has been marked as Exhibits 1A

18  through 1M as well as Exhibits 1D-1, 1E-1, and 1I-1.

19  A.   These -- these appear to be the pictures that I took that

20  day.

21  Q.   So to start at the beginning, I see that you've looked

22  through them.

23  A.   Yes.

24  Q.   Do you recognize these?

25  A.   I do.

Byarski – Direct                                           61

1  Q.   And you said they appear to be pictures that you took that

2  day?

3  A.   Correct.

4  Q.   And the exhibits that were at the end, denoted with the

5  dash 1 at the end, do those appear to be just closeups of

6  pictures that you took that day?

7  A.   They do.

8  Q.   Do these appear to be true and accurate depictions of

9  pictures that you took at that house on the day of the search?

10 A.   Yes, ma'am.

11       MS. NEE:  Your Honor, previously we moved and

12 admitted Exhibits 1A through 1E as well as 1M.  The Government

13 would now like to admit 1F threw 1L, as well as, I guess, 1I-1

14 I believe was not previously admitted, but the rest of the

15 photographs.

16       MR. RUPP:  No objection.

17       THE COURT:  Received into evidence.

18 BY MS. NEE:

19 Q.   If we could please show again Exhibit 1A.  And is this

20 what you recognize to be the entrance to Room D?

21 A.   Correct.

22 Q.   And could we show Exhibit 1B?  Is this also Room D?

23 A.   Yes.

24 Q.   Exhibit --

25 A.   Okay.

Byarski – Direct                                                          62

1  Q.   Exhibit 1C, is that also what you recognize to be within

2  Room D?

3  A.   Yes.

4  Q.   Exhibit 1D, please.  Is that also a photograph that you

5  took in Room D?

6  A.   Correct.

7  Q.   And Exhibit 1E, this one as well?

8  A.   Yes, ma'am.

9  Q.   1F, did you also take this photograph in Room D?

10 A.   I did.

11 Q.   1G?

12 A.   That one also.

13 Q.   And 1H.  Now, this item was an item that appears to be an

14 item of mail; is that correct?

15 A.   Yes, ma'am.

16 Q.   And was that taken within the location at 118 South

17 Lincoln Street on the day of the search?

18 A.   It was.

19 Q.   1I, please.  Did you take this photograph within Room D as

20 well?

21 A.   Yes.

22 Q.   And at this point in time, you mentioned that you take

23 photos at different times?

24 A.   Correct.

25 Q.   It appears here that the draw of the dresser is open.

1  Does that tell you anything about when you took this particular

2  picture with regards to the search of the house?

3  A.    Again, normally, like I say, we would take pictures when

4  we first get there with all the rooms as they are in the

5  original state, so this picture would probably be once a search

6  had started and an officer had located an electronic device

7  that they wanted a picture of before they were to seize it and

8  turn it over to the seizing officer.

9  Q.    The next exhibit, please, 1J.  Would this also have been

10 taken -- did you take this within Room D?

11 A.    Yes.

12 Q.    1K, please.  Did you also take this photograph within that

13 same room?

14 A.    Yes, ma'am.

15 Q.    And 1L, did you take this photograph?

16 A.    I did.

17 Q.    And 1M, did you also take this photograph within 118 South

18 Lincoln Street as well on the day of the search?

19 A.    I did.

20         MS. NEE:  At this point I have no further questions

21 for this witness and tender the witness for cross-examination.

22         THE COURT:  Cross examination.

23                         CROSS-EXAMINATION

24 BY MR. RUPP:

25 Q.    Good morning, sir.

1  A.   Good morning, sir.  How are you?

2  Q.   I'm well.  Thank you.

3        As far as your involvement in the execution of the

4  search warrant and taking photographs at 118, the address here,

5  fair to say you had never been in that home prior?

6  A.   Correct.

7  Q.   And you were not familiar with the contents prior to your

8  entry of that home?

9  A.   Correct.

10 Q.   You don't have any personal knowledge about how any of the

11 electronic device that you photographed got to be where they

12 were found?

13 A.   I do not.

14 Q.   And you don't have any personal knowledge about who had

15 access to those devices?

16 A.   No, sir.

17        MR. RUPP:  Thank you.  No further questions.

18        THE COURT:  Any redirect?

19        MS. NEE:  No, Your Honor.

20        THE COURT:  We'll excuse the witness from the stand.

21        (At 10:13 a.m., witness excused.)

22        THE COURT:  Ms. Nee, I'm anticipating taking perhaps

23 about 15 to 20 minutes of testimony and then taking a break.

24        MS. NEE:  That would be good for us, Your Honor.  I

25 believe this next witness will also be relatively quick.

1          THE COURT:  Good.  Thank you.

2          Good morning.

3          MS. BELANGER:  Good morning.

4          THE COURT:  If you could stop for just a moment,

5   raise your right hand.

6              (At 10:14 a.m., witness sworn by the Court

7          THE COURT:  If you could please have a seat.  As

8   we've been informing all the other witnesses, the chair does

9   not move, the microphone does, and we usually like to be about

10  10 inches away from your mouth so we get the best

11  amplification.  Thank you.

12         MS. NEE:  Before I start with the questions, I just

13  wanted to just to make the record clear, that as part of the

14  previous exhibits that we've admitted by now that includes

15  1D-1, 1E-1 and 1I-1 in addition to the underlying search

16  warrant photographs.  The defense has no objection.

17         THE COURT:  I thought that was clear.

18         MR. RUPP:  That was my understanding as well, Judge.

19         MS. NEE:  Thank you.

20                     AMY BELANGER,

21       GOVERNMENT'S WITNESS, SWORN AT 10:14 a.m.

22                  DIRECT EXAMINATION

23  BY MS. NEE:

24  Q.   Good morning.  Could you please state your name for the

25  record?

Belanger – Direct

```
1  A.    Good morning.  Amy Belanger.

2  Q.    Where are you currently employed?

3  A.    Michigan State Police.

4  Q.    And what is your position with the Michigan State Police?

5  A.    Currently I'm a trooper working the road.

6  Q.    How long have you been employed with the Michigan State

7  Police?

8  A.    About nine and a half years.

9  Q.    And could you describe what your principal roles and

10 duties have been during your time with the Michigan State

11 Police?

12 A.    I have been obviously the road trooper.  I've been the

13 community service trooper.  I've been a hostage negotiator and

14 I was a task force officer with the FBI office in Flint.

15 Q.    And which FBI task force were you a part of or what was

16 the focus of that task force?

17 A.    It's called NMCAC so it was the Northeastern Michigan

18 Crimes Against Children, and basically we focused on human

19 trafficking, sex crimes.

20 Q.    And have you participated in search warrants during your

21 time with the Michigan State Police?

22 A.    Yes, ma'am.

23 Q.    Have you participated in a number of search warrants?

24 A.    Many, yes.

25 Q.    On February 11th of 2020, did you participate in a search
```

Belanger – Direct                                                67

```
 1  warrant at a residence at 118 South Lincoln Street in Bay City,

 2  in Michigan?

 3  A.    Yes, ma'am.

 4  Q.    And, in particular, did you search a room during that

 5  search that had been marked as Room D?

 6  A.    Yes, ma'am.

 7  Q.    What type of room was that?

 8  A.    It was a bedroom.

 9  Q.    And what general areas of Room D did you search?

10  A.    Generally all over.

11  Q.    And did you find items that you identified as potential

12  evidence?

13  A.    Yes, ma'am.

14  Q.    What types of items in general?

15  A.    I located a cell phone that was in the upper left drawer

16  of the dresser in the bedroom, and I also located a laptop that

17  was on top of the dresser.

18  Q.    Were there other electronic devices as well that you

19  located?

20  A.    There were multiple, yes.

21  Q.    And I'd now like to hand you some exhibits if I may

22  approach?

23            THE COURT:  You may.

24  BY MS. NEE:

25  Q.    I am now handing you Exhibits 1A, 1B, 1C, 1D, 1F, 1I, and
```

Belanger – Direct                                                    68

1   that is it.  Do you recognize these items?

2   A.    Yes, ma'am.

3   Q.    What are they?

4   A.    They're photos of the bedroom that I searched.

5   Q.    Could we please have Exhibit 1A?

6   A.    Yes.

7   Q.    And is this the entryway to the room that you searched?

8   A.    Yes, ma'am.

9   Q.    And if we could see Exhibit 1C.  You mentioned I believe

10  searching in a dresser area?

11  A.    Yes, ma'am.

12  Q.    Is this the dresser located in the center of the picture

13  that you searched?

14  A.    Yes, ma'am.

15  Q.    Could we see Exhibit 1I, please.  Did you search this

16  dresser drawer that is shown in Exhibit 1I?

17  A.    Yes, ma'am.

18  Q.    And which dresser drawer was that on the dresser?

19  A.    It is the top left drawer.

20  Q.    And when you searched this item, did you ask for a

21  photograph to be taken?

22  A.    Yes, ma'am.

23  Q.    And why was that?

24  A.    That's our protocol; if we find an item of evidence, that

25  we leave it in its place, ask the photographer to take a

1  picture.

2  Q.   Could we also please see Exhibit 1D.  And did you also

3  search in this area of Room D?

4  A.   Yes, ma'am.

5           MS. NEE:  I believe that's all the questions that I

6  have for this witness.

7           THE COURT:  Cross-examination.

8                      CROSS-EXAMINATION

9  BY MR. RUPP:

10  Q.   Good morning, Trooper.

11  A.   Good morning, sir.

12  Q.   Prior to participating in the execution of that search

13  warrant over at 118 South Lincoln, had you been in that home

14  before?

15  A.   No.

16  Q.   So fair to say prior to your participation in that search

17  warrant, you weren't familiar with the contents of the home?

18  A.   Correct, sir.

19  Q.   You don't have any personal information about how or when

20  any of those electronic devices that you found got there?

21  A.   No, sir.

22  Q.   And you don't have any personal information about who all

23  might have had access to them prior to you being there for the

24  warrant?

25  A.   No, sir.

1          MR. RUPP:  Thank you.  Nothing further.

2          THE COURT:  Any redirect?

3          MS. NEE:  No, Your Honor.  That's it for this

4    witness.  Thank you.

5          THE COURT:  Okay.  We will excuse the witness.

6          (At 10:21 a.m., witness excused.)

7          THE COURT:  Mr. Drabczyk should be here shortly.  He

8    will see the jury to the jury room.  We'll take about a

9    10-minute recess and then return to the courtroom.  Please rise

10   for the jury.

11         (At 10:21 a.m., jury leaves.)

12         THE COURT:  Record will reflect the fact that we are

13   outside of the presence of the jury.

14         Ms. Nee, who do you anticipate your next witness will

15   be.

16         MS. NEE:  I'm sorry?

17         THE COURT:  Who do you anticipate your next witnesses

18   will be?

19         MS. NEE:  We will be returning to Detective Zapolski

20   next.

21         THE COURT:  Okay.  The record's closed.  We'll see

22   you in about 10 minutes.

23         (At 10:22 a.m., break taken.)

24         (At 10:41 a.m., break concluded.)

25         (At 10:42 a.m., jury arrives.)

Zapolski – Direct                                                         71

 1          THE COURT:  Welcome back.  Please be seated.  If you
 2   can identify the next witness, please.
 3          MS. NEE:  Your Honor, the Government will now recall
 4   Detective Zapolski.
 5          THE COURT:  And you're aware of the fact that you
 6   remain under oath?
 7          THE WITNESS:  Yes, sir.
 8          THE COURT:  Thank you.
 9                    EVAN ZAPOLSKI,
10          GOVERNMENT'S WITNESS, PREVIOUSLY SWORN
11                    DIRECT EXAMINATION
12   BY MS. NEE:
13   Q.   Detective Zapolski, when you were previously on the stand,
14   we focused on some of your background experience.  I would now
15   like to ask you a couple more details about that.
16          First, you testified that you've been with the
17   Michigan State Police since 2013; is that correct?
18   A.   Yes.
19   Q.   And during this time you mentioned that since 2017 you've
20   been associated with the Michigan State Police Computer Crimes
21   Unit and the Internet Crimes Against Children Task Force; is
22   that correct?
23   A.   Yes, that's correct.
24   Q.   And you also mentioned that between 2019 and 2021 you were
25   also associated with the FBI Northeast Michigan Trafficking and

Zapolski - Direct                                        72

```
 1   Exploitation Crimes Task Force?
 2   A.    Yes.
 3   Q.    And that in September, 2021 you were promoted to a
 4   supervisor position within the MSP Computer Crimes Unit; is
 5   that correct?
 6   A.    Yes.
 7   Q.    So what now have been some of your main duties during the
 8   five years that you've been with the MSP Computer Crimes Unit,
 9   Internet Crimes Against Children Task Force?
10   A.    Investigating child exploitation, proactive cases such as
11   NCMEC tips, as well as doing digital forensics for area law
12   enforcement.
13   Q.    And what were some of your main duties when working with
14   the FBI's Northeast Michigan Trafficking and Exploitation
15   Crimes Task Force for approximately two and a half years?
16   A.    The main responsibilities were conducting federal child
17   pornography investigations.
18   Q.    I'd like to talk some more now about your experience
19   specifically with forensic examinations.  Is one of your
20   current duties to still to conduct forensic examinations of
21   electronic devices?
22   A.    Yes.
23   Q.    And how long have you been doing forensic examinations of
24   electronic devices?
25   A.    Since February of 2017.
```

Zapolski – Direct

1  Q.   And when we say "forensic examinations of electronic

2  devices," what types of devices are we talking about here?

3  A.   I'm certified to do digital forensics on cell phones,

4  tablets, as well as micro SD cards.  I also have on-the-job

5  training for the analysis of computers.

6  Q.   You mentioned certification with respect to a cell phone.

7  Is a cell phone also considered a type of computer?

8  A.   Yes, it is.

9  Q.   And we talked about doing forensic examinations of digital

10  devices.  At a really high level, what does that mean to do a

11  forensic examination of an electronic device?

12  A.   It means to extract data from the device.

13  Q.   And as part of that or after that, would you also then

14  conduct analyses of the data that's extracted or from a device?

15  A.   Yes.  The data is extracted from the device and then it's

16  analyzed to be in a more readable format.

17  Q.   And also kind of at a high level to explain for the jury,

18  what are the main general steps that are involved when you set

19  out to do and to accomplish a forensic examination?

20  A.   The first steps are to identify the make and model of the

21  actual device to determine what proper software is to be used

22  to actually extract the data from the device.

23  Q.   And once you've done that, do you then attempt to extract

24  the data from the device?

25  A.   Yes.

Zapolski - Direct

1   Q.   And when we talk about extracting data, can you just put

2   that in simpler terms?  What are we talking about doing?

3   A.   Making a copy of whatever is on that device for us to work

4   on.

5   Q.   And depending on the device, can you sometimes make a

6   complete copy?

7   A.   Yes.

8   Q.   And when we talk about complete copies, does that mean

9   that -- what does that mean, I guess?

10  A.   It means copying all of the data bit by bit or all of the

11  ones and zeros from the device.

12  Q.   And are there times when you're not able to do a complete

13  bit-by-bit copy of the device?

14  A.   Yes.

15  Q.   And what happens in those circumstances?

16  A.   When we can't get a full extraction of the device, we do

17  the next best type of extraction, and typically it's just a

18  basic extraction, which essentially means that we will extract

19  the data that you can see when you're actually scrolling

20  through a phone.

21  Q.   And the difference between those two in terms of the type

22  of data that you get in a bit-by-bit copy versus the more basic

23  copy, what kind of data is the difference between those two

24  copies?

25  A.   Typically with a basic extraction we can't recover some

Zapolski – Direct

1  chat applications, some chat messages, as well as sometimes we

2  can't recover deleted information during a basic extraction.

3  Q.   When you, let's talk about now how you -- you mention

4  certifications.  Have you then received training and

5  certifications relating to forensic examinations of a variety

6  of digital devices using different tools?

7  A.   Yes.

8  Q.   Have you received certifications and training specifically

9  with respect to extractions on cellular phones?

10 A.   Yes.

11 Q.   And what are these certifications that you've earned?

12 A.   The company Cellebrite makes forensic software.  They also

13 certify law enforcement and other people to use their software

14 and to understand it.

15 Q.   And have you received certifications from Cellebrite?

16 A.   Yes, I have.

17 Q.   And what certifications would those be then?

18 A.   I'm a Cellebrite certified operator, Cellebrite certified

19 physical analyst, and a Cellebrite advanced smartphone analysis

20 examiner.

21 Q.   Let's take those one by one.  A Cellebrite certified

22 operator, what does that certification mean that you're

23 certified to do?

24 A.   Basically to successfully operate Cellebrite's hardware,

25 their extraction softwares.

Zapolski – Direct                                                    76

```
 1   Q.   And you mentioned a Cellebrite certified physical analyst
 2   certification.  What does that allow you to do?
 3   A.   It allows me to successfully use the analyzer programs
 4   that they have which analyzes the data that is extracted from
 5   the cell phones.
 6   Q.   And you mentioned a Cellebrite advanced smartphone
 7   analysis certification, and what does that certification mean?
 8   A.   That certification is essentially just a little bit more
 9   to the analysis side, just a little bit of tips and tricks
10   essentially.
11   Q.   Did you have to go through training to obtain these
12   certifications?
13   A.   Yes.
14   Q.   And was it multiple hours of training, in fact?
15   A.   Yes.
16   Q.   Have you also attended other trainings or conferences
17   regarding forensic examinations of digital devices including
18   cellular phones?
19   A.   Yes.
20   Q.   Would it be safe to say that you've had hundreds of hours
21   of training in relation to these topics?
22   A.   Yes, that's correct.
23   Q.   Have you also attended conferences involving crimes
24   against children and including investigation of cell phone data
25   in these types of investigations?
```

Zapolski - Direct

```
 1  A.    Yes.
 2  Q.    Are these generally fairly large conferences in terms of
 3  the number of attendees?
 4  A.    Yes.
 5  Q.    And do you also update your education in the field
 6  regularly?
 7  A.    I do.
 8  Q.    And why is that?
 9  A.    Because everything -- the world of digital forensics is
10  always changing and evolving, just to stay current.
11  Q.    You mentioned certifications regarding Cellebrite and
12  hardware and software by Cellebrite.  What are some of the
13  hardware/software programs for Cellebrite that you have been
14  trained to use?
15  A.    So the extraction software would be Cellebrite 4PC, which
16  extracts the data or copies data from those devices, and then
17  Cellebrite Physical Analyzer analyzes the extraction data and
18  categorizes the data into data such as call logs, messages,
19  pictures, videos, notes saved on the phone, internet searches,
20  web history, web bookmarks.
21  Q.    Is that just basically a process that allows you to review
22  the phone more easily using that program?
23  A.    Yes.  Once the data is extracted from the device, it is
24  basically unreadable until it's analyzed within that software
25  that's when all of the data is categorized into those
```

Zapolski – Direct

1  categories.

2  Q.   But does the process of using the Physical Analyzer

3  program or analyzing that, does that alter the data in anyway?

4  A.   No, it does not.

5  Q.   To your knowledge, is the Cellebrite, let's call it,

6  family or suite of tools widely used within the Michigan State

7  Police and also the FBI that you've worked with?

8  A.   Yes.

9  Q.   Is it also widely used by other law enforcement agencies?

10  A.   Yes.

11  Q.   And generally accepted in the field of computer and cell

12  phone forensics by law enforcement and private investigators?

13  A.   It is.

14  Q.   Have you found this hardware and software for Cellebrite

15  to be reliable in your work with it?

16  A.   Yes.

17  Q.   Has it been capable of giving consistent results?

18  A.   Yes.

19  Q.   And are these results capable of being reproduced?

20  A.   Yes.

21  Q.   Have you previously testified about cell phone forensic

22  examinations?

23  A.   Yes, I have.

24  Q.   Approximately how many times have you done that?

25  A.   About 10 times.

Zapolski - Direct                                                    79

1   Q.    And very generally in what types of courts?

2   A.    In District and Circuit Courts.

3   Q.    Meaning state of Michigan courts?

4   A.    Yes.

5   Q.    And since you joined the computer crimes unit in February,

6   2017, approximately how many forensic extractions and analyses

7   do you believe that you've conducted with respect to cell

8   phones and tablets approximately?

9   A.    Yeah, I would estimate more than 800 devices.

10  Q.    And have these been over a variety of different types of

11  cell phones and tablets?

12  A.    Yes.

13  Q.    And, for instance, what are some of the main operating

14  systems that you've worked with?

15  A.    The main operating systems that I've encountered would be

16  the Apple iOS operating system on Apple phones, as well as the

17  Android operating system on devices such as Samsungs or LGs,

18  Coolpads.

19  Q.    And when we talk about the operating system, I guess is

20  there a kind of a basic layperson's explanation of what that

21  means?

22  A.    It's basically the proprietary software that's installed

23  on a device that allows it to operate.

24  Q.    With regards to the forensic examinations and extractions

25  and analyses that you have performed on cell phones and

Zapolski – Direct                                              80

1  tablets, do you have a rough estimate of the proportion of

2  those that were related to child pornography or child

3  exploitation investigations?

4  A.    I would estimate about a third.

5  Q.    And what are some of the other types of investigations for

6  which you've done these types of forensic extractions or

7  analyses?

8  A.    Well, at the computer crimes unit, like I've testified

9  previously, we're kind of a dual support unit where we do

10 digital forensics for other law enforcement in the area as

11 well, so I do analysis on devices for homicides, assaults,

12 sexual assaults, stalking, larcenies, breaking and entering,

13 any type of crime.

14 Q.    And it's safe to say that based on what you've said so far

15 that you probably conducted hundreds of forensic examinations

16 or analyses related to child pornography or child exploitation?

17 A.    Yes.

18 Q.    During your work on these types of cases, since 2017, have

19 you become familiar with the identification of child

20 pornography as it is defined under federal law?

21 A.    Yes.

22 Q.    And would you agree that in general that involves images

23 showing a minor engaging in sexually explicit conduct or a

24 lascivious exhibition of the genital area --

25 A.    Yes.

Zapolski - Direct                                                    81

1   Q.    -- roughly?

2            Based on your training and experience in the area of

3   child pornography and child exploitation investigations, have

4   you also become familiar with certain words and abbreviations

5   that -- and websites that are used in the context of child

6   pornography?

7   A.    Yes.

8   Q.    And have you also become familiar with those things with

9   respect to investigations involving people who have a sexual

10  interest in children?

11  A.    Yes.

12  Q.    At this point I would like to ask you questions about the

13  forensic examinations conducted on the cellular phones in this

14  case and about your opinions based on these forensic

15  examinations.

16           Did you conduct forensic examinations on digital

17  devices in connection with this case?

18  A.    Yes.

19  Q.    And in particular I'd like to focus on your examination of

20  three cellular phones that were previously admitted as Exhibits

21  2A, 3A and 4A.  Did you examine these three cell phones?

22  A.    Yes, I did.

23  Q.    Were these cellular phones locked?

24  A.    Yes.

25  Q.    And what -- what do you do in general when cell phones are

Zapolski - Direct                                                    82

1   locked?

2   A.   If we have the device's passcode, we will just disable the

3   passcode and do the extraction.  If we don't have the passcode,

4   we can use Cellebrite 4PC to try to either disable the passcode

5   or bypass the passcode and still be able to do the extraction.

6   We also have a tool called Cellebrite Premium which will -- one

7   of its functions is to identify the passcode.

8   Q.   And are you always successful in being able to find out

9   the passcode in using these programs for cellular devices?

10  A.   No, not always.

11  Q.   In this particular case, was a passcode able to be

12  obtained or bypassed?

13  A.   Yes.

14  Q.   And how did that happen in this case?

15  A.   One of the devices that was seized from Room D was

16  connected to Cellebrite Premium at the passcode was identified

17  as 0994, and then that passcode was used to unlock the three

18  phones that we're discussing.

19  Q.   So that means that the passcodes of the three phones that

20  we're discussing were all that same number, 0994?

21  A.   That's correct.

22  Q.   You mentioned briefly in passing deleted items and the

23  extraction of information relating to deleted items.  When

24  you're performing cell phone extractions using Cellebrite

25  programs, can you extract everything that was ever on a cell

1  phone?

2  A.    No.

3  Q.    Can you get some -- copy some data that was previously

4  deleted by the user of the phone?

5  A.    Yes.

6  Q.    And why is that or how is that?

7  A.    When a user deletes something from their phone, it doesn't

8  actually leave the phone.  It gets moved into the unallocated

9  space or essentially the deleted space of the phone, and as the

10  user continues to use the phone and save pictures and videos,

11  that deleted space essentially gets written over by the new

12  data, whether it be a picture or video, and then that

13  previously deleted information is then gone from the phone.

14  Q.    And so if you're able to perform -- you mentioned the

15  complete bit-by-bit copy, does that result in sometimes also

16  copying that data associated with items deleted by the user?

17  A.    Yes, the bit-by-bit or the full extraction will obtain

18  deleted information.

19  Q.    I'd like to now talk about some aspects of insuring data

20  integrity while you're doing forensic examinations.  What steps

21  are taken during the forensic examination process in order to

22  ensure the integrity of the data that you're looking at?

23  A.    Well, the data -- or, excuse me, the evidence is

24  controlled within the property room within the evidence bag

25  itself.  We also do hash values on the data.

Zapolski - Direct                                                    84

```
 1  Q.   So you mentioned a hash value.  What is a hash value?

 2  A.   That's essentially a digital fingerprint for a file.

 3  Q.   And what does it look like?

 4  A.   It's an alphanumerical string of numbers and letters.

 5  Q.   Is it fairly long?

 6  A.   Yes.

 7  Q.   And how is it -- you said it's a digital fingerprint for a

 8  file.  How is it generated for a file?

 9  A.   Certain characteristics of that file, our -- they are put

10  into a mathematical equation that will then generate the hash

11  value, and the hash value is unique to that file.

12  Q.   Is this a process that is -- you mentioned a mathematical

13  equation is used for that.  Is it a process that's

14  reproducible?

15  A.   Yes.

16  Q.   So if you took the exact same file and you obtained a hash

17  value for it, and then you did it a second time, for instance,

18  would you -- would those be -- would those result in the same

19  digital fingerprint?

20  A.   Yes.

21  Q.   What would happen if you changed something about that

22  file, something small like if it's a document with text in it

23  and you added a period, would that still result in the same

24  hash value?

25  A.   No.  If a period was added to a word document, or if a
```

1  single pixel was changed in a picture or a video, the hash

2  value would be completely different.

3  Q.    And in terms of other aspects of hash values, so we can

4  understand this concept better, what about images that are

5  visually similar?  So to the human eye it looks like it's the

6  same picture, for instance, does that necessarily mean that

7  they'll have the same hash value?

8  A.    It does not necessarily mean that they'll have the same

9  hash value.

10  Q.    And why might that be the case --

11  A.    It may be --

12  Q.    -- a hash value, excuse me.

13  A.    Can you ask that again, I'm sorry.

14  Q.    Why might that be the case that something that visually

15  looks the same would have a different hash value?

16  A.    It may be that the images have different dimensions, which

17  could change the hash value; as well there could be slight

18  pixels that are different between the images, which would

19  result in a different hash value, but we may not be able to

20  pick that up with just our eye alone.

21  Q.    When you talk about different dimensions, are you talking

22  about like the physical sort of the size of the file, I guess?

23  A.    Yes.

24  Q.    And if you take screenshots or, you know, if you take a

25  picture of a picture, will that result in same or different

1  hash values generally?

2  A.   That would make a different hash value.

3  Q.   Because in the eye of the data -- is that because in the

4  eye of the data, it's not the exact same file?

5  A.   That's correct.

6  Q.   Now, you mentioned that a hash value or a digital

7  fingerprint is created during the process of your forensic

8  examination for the data.   When -- when does the -- when is

9  there a hash value taken in the forensic examination process,

10 or when is it made?

11 A.   Before the extraction and then afterwards the extraction

12 is then hashed, the hash value is created.   And then once we

13 start doing the analysis on the extraction, we also generate a

14 hash value ourselves to verify that nothing has changed.

15 Q.   So you do this -- do you do this because you can tell from

16 the hash values whether the data has changed?

17 A.   Correct.

18 Q.   And is it your understanding that if the hash value is the

19 same, then the data is still the same?

20 A.   That's correct.

21 Q.   And, conversely, if the hash value has changed, then

22 something about the data has changed?

23 A.   That's right.

24 Q.   I'd like to ask you about the role of search warrants in

25 your forensic examinations.   In general, how does a search

1  warrant affect your forensic examination?

2  A.   A search warrant directs us to what type of evidence we

3  can search for on the device.

4  Q.   And in this case you mentioned you had a search warrant

5  for those devices; is that correct?

6  A.   Yes.

7  Q.   And did you also then use that search warrant to guide

8  what you could search for in these phones?

9  A.   Yes.

10            MS. NEE:  All right.  I'd like to approach the

11  witness again, Your Honor, with some exhibits.

12            THE COURT:  You may.

13            MS. NEE:  I've handed the witness exhibits marked as

14  2A, 3A and 4A and previously admitted.

15  BY MS. NEE:

16  Q.   You previously testified that you recognize these items.

17  Can you summarize again for the jury what these items were and

18  where they were found in the house that was searched that day?

19  A.   Yes.  2A is the Coolpad cell phone.  This device was

20  located on the bed within Room D.

21            Device 3A is an LG cell phone.  This device was

22  located on the ground next to the bed and the shoe box within

23  Room D.

24            And device 4A is also an LG cell phone.  It was

25  located in the top dresser drawer within Room D.

1  Q.   You mentioned previously that the same passcode, 0994, was

2  used to unlock all three of these phones; is that correct?

3  A.   Yes.

4  Q.   And in the course of the investigation, did you determine

5  any significance to that number 0994?

6  A.   Yes.  It's the last four digits of Mr. Zube's Social

7  Security number.

8  Q.   Were you able to extract data from these three phones

9  using the same general process that you described earlier for

10 extracting data from cell phones?

11 A.   Yes.

12 Q.   And what software or hardware did you use to do that in

13 this case?

14 A.   Cellebrite 4PC was used to extract the data from these

15 devices.

16 Q.   And were you able to obtain that complete bit-by-bit copy

17 of the data from each of these cell phones?

18 A.   Not from each of them, no.

19 Q.   Which ones were you able to do that for, if any?

20 A.   We were able to get the full extraction on the Coolpad

21 cell phone, 2A, as well as the LG cell phone, 4A.

22 Q.   And what about the other phone, 3A, which was the one I

23 believe that was found on -- next to the bed on the floor?

24 A.   Yes.  3A wasn't compatible with our software to obtain a

25 full extraction, so I did a basic extraction on that device.

1   Q.    And, in your experience, when you do a basic extraction,

2   is the data that you extract still accurate?

3   A.    Yes, it's still accurate.

4   Q.    But would it be safe to say it's simply less -- it's just

5   not everything on the phone?

6   A.    That's correct.

7   Q.    And did you obtain hash values for these extractions in

8   the process that you described previously?

9   A.    Yes.

10  Q.    And during -- before, during and after your analysis I

11  believe you mentioned in terms of your general hash procedure,

12  did you compare the hash values that you ran at later times

13  against the digital fingerprint hash value that you obtained

14  when the data was extracted?

15  A.    Yes.

16  Q.    And at those times, were the hash values the same?

17  A.    Yes.

18  Q.    And, in your opinion, did that mean that the data -- that

19  the data integrity of that data had been preserved during the

20  process of your review?

21  A.    Yes.

22  Q.    Did you also use software tools in this particular case to

23  examine these three cell phones?

24  A.    Yes.

25  Q.    And what software tool did you use?

Zapolski - Direct                                          90

1   A.   Cellebrite Physical Analyzer.

2   Q.   I'd like to talk now or switch now to talk about

3   identifying child pornography.  Did you find images of child

4   pornography and/or video of child pornography and related data

5   on these phones?

6   A.   Yes.

7   Q.   You mentioned earlier that based on your training, you're

8   aware of the federal definition of child pornography, correct?

9   A.   Yes.

10  Q.   And in general as a child, what's the federal definition

11  of a child for purposes of federal child pornography?

12  A.   A minor engaged in sexually explicit conduct.

13  Q.   And when you say "a minor," what kind of age range are we

14  talking about?

15  A.   A person under the age of 18.

16  Q.   Based on your experience with child pornography and child

17  exploitation investigations, do you feel like you can identify

18  child pornography that meets this definition when you see it?

19  A.   Yes.

20  Q.   And is it also sometimes part of your job to estimate ages

21  of potential victims in these pictures and videos?

22  A.   Yes.

23  Q.   And how do you do that?

24  A.   I look at the genitalia development, if there's any sort

25  of pubic hair on the child, as well as breast development and

Zapolski – Direct                                              91

1  general body size.

2  Q.   Now, there's been a term that we've been using that's a

3  prepubescent child.  What does that mean to you?

4  A.   That means a child that has not reached puberty.

5  Q.   And have you had experience in identifying prepubescent

6  children, images of prepubescent children versus pubescent

7  children?

8  A.   Yes.

9  Q.   Have you also had experience in identifying ages of

10 children under the age of 12, for instance?

11 A.   Yes.

12 Q.   Have you had to do this for many images and videos in your

13 experience?

14 A.   Yes.

15 Q.   Is it safe to say that there may have been thousands of

16 such instances where you've done this?

17 A.   Yes.

18 Q.   Do you also have the ability to send hash values or

19 digital fingerprints of suspected child pornography files to be

20 verified against databases of child pornography?

21 A.   Yes.

22 Q.   And how -- who maintains those databases, first of all?

23 A.   The National Center for Missing and Exploited Children.

24 Q.   Is that the same entity that you talked about before from

25 whom you received that cyber tip?

Zapolski - Direct

1   A.    Yes.

2   Q.    And how do you go about checking whether there's been a

3   match in the database maintained by that organization for an

4   image that you find?

5   A.    We will send the hash values to NCMEC, and then they will

6   provide a report back indicating if that hash value depicts an

7   identified child.

8   Q.    And did any of the images that you found in this case

9   result in any matches against that database?

10  A.    Yes.  There were known children depicted on 3A and 4A.

11  Q.    I'm sorry, if you could please not look at other items.

12  Do you recall which -- which items were -- involved

13  different -- or, I'm sorry, were you looking at the phones?

14  A.    Yes.

15  Q.    Okay.  I'm sorry, go ahead.

16  A.    It was 3A and 4A had pictures of identified children.

17  Q.    Do you recall how many?

18  A.    I don't.

19  Q.    Is there something that would assist you in remembering

20  how many --

21  A.    Yes, my police report.

22  Q.    -- images.

23          MS. NEE:  Just one second.  If I may approach.

24  BY MS. NEE:

25  Q.    Is there a particular report -- is there a particular

1   report that would assist you in recalling that information?

2   A.   One of my supplemental reports has that information.

3   Q.   All right.  Do you have a copy of the supplemental report

4   within your general area up there?

5   A.   Yes.

6   Q.   Would you take a look at it now and look at it silently to

7   yourself.

8            Have you been able to refresh your recollection as to

9   how many items were matched in hash values with the database?

10  A.   Yes.

11  Q.   So without looking at any of your reports then, could you

12  tell us how many matches there were.

13  A.   There was one identified child image on the device located

14  on the floor next to the bed, and there were three identified

15  children within the pictures located on the phone located

16  within the top dresser drawer.

17  Q.   What might be some of the reasons why there might be an

18  image of child pornography but there is no match against this

19  database?

20  A.   It could be that the child is simply not identified yet,

21  no law enforcement has identified that child, or it could be

22  that the hash value is just unknown to NCMEC, and it's

23  essentially just changed at some point.

24  Q.   So, for instance, as we talked about before, if somebody

25  changed the size or took a snapshot of it in some way or

1   another, it might look the same but, in fact, it wouldn't be

2   identified by its hash value as being the same?

3   A.    That's correct.

4   Q.    Let's talk about some terms associated with child

5   pornography relating to websites or terminology that's used.

6   Are you familiar the terminology "no nude"?

7   A.    Yes.

8   Q.    And what is your knowledge regarding that terminology in

9   the context of child pornography investigations?

10  A.    A website that has "no nude" within the title will depict

11  children that are clothed but it's typically a website that

12  somebody was interested in child pornography will visit because

13  they know child pornography is illegal.

14  Q.    And what type of -- is there a -- is "no nude" also known

15  by other abbreviations?

16  A.    NN, the letters.

17  Q.    How about "star sessions"?  Does star sessions have

18  meaning to you in the context of child pornography

19  investigation?

20  A.    Yes.  There's a star sessions website as well as a water

21  mark that sometimes appears on pictures that's well known

22  within the child pornography field that typically has children

23  that are nude in modeling positions, and there's closeups on

24  the genitalia pretty frequently.

25  Q.    How about the initials "LS," what do those mean in the

Zapolski – Direct                                                    95

1   context of child pornography investigations?

2   A.    LS stands for Lolita Studios.   That is a company from

3   Eastern Europe that used to specialize in modeling for

4   children, and frequently the children would be dressed and then

5   throughout the photo shoot essentially they would become

6   undressed and focuses on their genitalia would be frequent.

7   Q.    How about the letters "YO," what does that tend to signify

8   in child pornography investigations?

9   A.    YO is typically shorthand for year old, so websites would

10  typically have four, five, six YO, just indicating how old

11  those people will be on those websites.

12  Q.    What about the term hebephilia?

13  A.    Hebephilia is the sexual interest in children from the

14  ages of 11 to 14, and shorthand is sometimes called "hebe," the

15  letters H-E-B-E.

16  Q.    I'd like to talk about some of your findings on the

17  devices that you analyzed in this case.   Did you search for the

18  presence of child pornography on the three phones that we have

19  previously admitted into evidence that were found in Justin

20  Zube's room at 118 South Lincoln Street on February 11th of

21  2020?

22  A.    Yes.

23  Q.    Approximately how many total images or videos did you find

24  on each of the devices that you, in your opinion, believed to

25  be child pornography?

Zapolski - Direct                                               96

1   A.    There were six files on the Coolpad cell phone, which is

2   2A.   There were 74 files on the LG, 3A, located on the floor,

3   and there was 307 child pornography files found on the LG cell

4   phone that was in the top dresser drawer.

5   Q.    So is that a total, if I've done the math right, of about

6   387 files?

7   A.    I believe so.

8   Q.    Were any of the CP images -- or child pornography images,

9   excuse me -- that you found on these devices visually similar

10  between different devices?

11  A.    Yes.

12  Q.    Did you also find other evidence relevant to the

13  investigation while analyzing these cellular phones?

14  A.    Yes.

15  Q.    Generally speaking, what were these other types of

16  relevant evidence?

17  A.    Well, the original Snapchat account that was reported by

18  the National Center for Missing and Exploited Children was

19  located on at least one of the cell phones, that would be the

20  username s4s2019clean.

21  Q.    And did you also find, in general, other relevant evidence

22  in -- regarding user account information on these phones?

23  A.    Yes.  There were --

24  Q.    Sorry.  In general, what kinds of relevant information did

25  you find with regards to user account information?

1  A.   The phone number originally reported by Sprint,

2  (989)443-0206, was located on several of the cell phones, as

3  well as usernames and passwords that were either Justin Zube's

4  name or derivatives of his name and his year of birth.

5  Q.   What was that year of birth?

6  A.   1987.

7  Q.   Did you also find other relevant information or

8  information that you believed to be relevant to a child

9  pornography investigation in other parts of the phone as well?

10 A.   Yes.  There was evidence located within the bookmarks and

11 the web history.

12 Q.   I'd also like to talk about metadata.  What is metadata in

13 general?

14 A.   It's basically data about data, so sometimes we will get

15 the device make and model of whatever device took a picture.

16 Sometimes we may just get like the created date of the actual

17 file.

18 Q.   And do you also -- for files in your extractions, do you

19 also obtain information about where those files were located

20 within a phone?

21 A.   Yes.  When we are reviewing the images and videos within

22 Physical Analyzer, the pictures and videos will be broken down

23 by where they were stored on the phone itself.

24 Q.   And what does that generally look like?

25 A.   It'll generally look like a folder structure -- yeah,

1  folder structure.

2  Q.   Is that kind of like a folder structure that you might see

3  or a file path that you might see on like a computer as well?

4  A.   Yes, similar.

5  Q.   And would it be fair to say that within a folder structure

6  there will be kind of different subfolders with various names?

7  A.   Yes, that's correct.

8  Q.   And are you able, based on experience and training then,

9  to determine other information about an image based on where it

10 is located on a cell phone?

11 A.   Yes.

12 Q.   Now, did you create reports of the data from these three

13 phones that you analyzed?

14 A.   Yes, I did.

15 Q.   And which software tool did you use to do that?

16 A.   Physical Analyzer.

17 Q.   I'd like to now talk specifically about your findings with

18 respect to Exhibit 2A, which you mention was the Coolpad that

19 was found on the bed in Mr. Zube's room.

20          Did you create an initial report using Cellebrite

21 that included data from this Exhibit 2A?

22 A.   Yes.

23 Q.   And what were the main categories of information that you

24 included in that report?

25 A.   User accounts, the device information, the pictures,

1  videos, web history, web bookmarks.

2  Q.    Were there also information about applications, for

3  instance, and various other things that we've -- other types of

4  information that we've discussed so far?

5  A.    Yes.

6  Q.    And did you include information relating to all images or

7  just the ones that you believed might be suspected CP or were

8  suspected CP in your opinion?

9  A.    Can you rephrase that?

10 Q.    Okay.  In the images that you entered into -- or that you

11 used as part of your report that you created, were those all

12 the images on the phone, or did you only include images that,

13 in your opinion, met the federal definition of child

14 pornography?

15 A.    I created several reports.  The one that we'll discuss, I

16 believe, just contains the child pornography.

17 Q.    Is it fair to say that all this information was fairly

18 lengthy?

19 A.    Yes.

20 Q.    And for purposes of presenting information, did you work

21 on a shorter version of this report, let's say?

22 A.    Yes.

23 Q.    And how was this shorter version of the report created?

24 A.    Within Physical Analyzer, a PDF can be created of specific

25 data.  From there certain pages of the PDF can be removed that

Zapolski - Direct

1  doesn't have any sort of evidentiary value.

2  Q.    And in the process of creating the PDF report or of just,

3  you know, removing pages to make the report shorter, is any of

4  the data that's actually contained in the report changed in

5  anyway?

6  A.    No.

7  Q.    I'd now like to approach.  I'm handing you what's been

8  marked as Exhibit 2B.  Do you recognize this?

9  A.    Yes, I do.

10 Q.    How do you recognize it?

11 A.    This is the Cellebrite report that I created for Item 3A,

12 the Coolpad cell phone.

13 Q.    Sorry, you said 3A.  Is that 2A?

14 A.    Yes, excuse me, 2A.

15 Q.    And is the report that you have in your hand the sort of

16 shorter version that includes some specific relevant

17 information?

18 A.    Yes.

19 Q.    And did you create this excerpted report using the process

20 that we just described previously?

21 A.    Yes, I did.

22 Q.    Is there also some highlighting that you've added onto

23 pages, certain pages, of this exhibit?

24 A.    Yes.

25 Q.    And was that just to help the jury eventually follow along

Zapolski - Direct

 1  during your testimony with what we're talking about?

 2  A.    Yes.

 3  Q.    And did adding the highlighting in any way alter the kind

 4  of the underlying text information in the report?

 5  A.    No.

 6  Q.    So apart from what we've discussed in this process, is

 7  that data that's included in Exhibit 2B an accurate copy of the

 8  corresponding data that was on the Coolpad phone?

 9  A.    Yes.

10            MS. NEE:  Your Honor, I'd move to admit Exhibit 2B.

11            MR. RUPP:  No comment.

12            THE COURT:  Admitted.

13  BY MS. NEE:

14  Q.    I'd like to start at the top of the first page of the

15  report, if we could, for Exhibit 2B.  For this portion, I'm

16  going to turn this television on, if I can.

17            THE COURT:  Certainly.

18  BY MS. NEE:

19  Q.    So if we could start at the top of this first page of the

20  Cellebrite report.  It says on the top right corner,

21  "Cellebrite," right and then top left it says, "Extraction

22  Report," is that accurate?

23  A.    Yes.

24  Q.    And is that the typical format for these Cellebrite

25  reports that you would see?

Zapolski - Direct

1    A.    Yes.

2    Q.    We're looking at the summary section here, and what's the

3    typical information that's included in the summary section?

4    A.    This information is the version of the software that I

5    used, also the date that I created the report.  My name is

6    there as the examiner because I did the analysis.  The case

7    number is something that I inputted.  That's the Michigan State

8    Police report number, as well as our property item number, and

9    then the bottom is Michigan State Police just to denote which

10   agency did the analysis.

11   Q.    So some of this information is information that you

12   actually input into the system to identify this work, if you

13   will, correct?

14   A.    Yes.

15   Q.    And is any information that is included later in the

16   report information that you would have added versus information

17   which was extracted from the phone or was just kind of, you

18   know, Cellebrite's own report data?

19   A.    I believe there may be tags within the report later on,

20   but other than the tags and this information, no.

21   Q.    Okay.  And we can talk about the tags as we get there.

22         If we can look down now to the next category of

23   information.  It says, "Source Extraction."  What sort of stuff

24   is in this part of the report, or what sort of information?

25   A.    This information is when the extraction actually took

1 place, the type of cable that was used to connect the device to
2 my computer itself, as well as the model number and the version
3 number of the extraction software.
4 Q.   And if we go back actually up to the source extraction --
5 there we are.
6          There's -- under the device, the selected device
7 name, there's information there I believe under that line that
8 says cp3705AS; is that correct?
9 A.   Yes.
10 Q.   And the CP, based on your experience, what does that stand
11 for?
12 A.   That's just shorthand for Coolpad, the type of phone that
13 this is.
14 Q.   And a couple lines down from that there's an "is
15 encrypted" row, is that correct, and it says "True"?
16 A.   Yes.
17 Q.   And what does that indicate?
18 A.   Just that the data was originally encrypted when we did
19 the extraction.
20 Q.   And were you -- was -- were you able to un-encrypt it
21 using the passcode essentially that we discussed earlier?
22 A.   Yes.
23 Q.   And the last line there it says, "Extraction (UFD) file
24 data integrity;" is that correct?
25 A.   Yes.

Zapolski - Direct

1  Q.   And after that it says, "Intact?"

2  A.   Yes.

3  Q.   And what does that signify to you?

4  A.   That's just referring back to the hash values again.  The

5  software -- the extraction software will could a self check of

6  the hash value to ensure that the data integrity is intact.

7  Q.   Is that basically meaning what we talked about earlier

8  where the hash values match before and after?

9  A.   Yes.

10 Q.   And this section is called -- it's labeled sort of as a

11 sub-label as "Physical," and is that the full bit-by-bit copy

12 that happens?

13 A.   Yes.

14 Q.   Moving down to the device information section, what sort

15 of general information is included in this area?

16 A.   This, again, would show the make and model of the device

17 the cp3705AS, the operating system version of Android that's on

18 this phone, as well as the phone number to this phone is

19 included in this section.

20      If you can see near the bottom, the "MSISDN," that

21 would be the phone number that's assigned to this phone.

22 Q.   And in this case, what was the phone number that was

23 assigned to that phone?

24 A.   (989)443-0206.

25 Q.   And was that a phone number that you later associated or

Zapolski – Direct

1  that you were able to associate with -- with Mr. Zube?

2  A.   Yes.

3  Q.   Was that based, as you testified previously, on the fact

4  that he used that number to contact FBI as well as other

5  information?

6  A.   Yes.

7  Q.   And was that also the phone number that was associated

8  with any other investigative information that you received in

9  this case?

10  A.   It was associated with the Sprint return reference the IP

11  address used on the suspect's Snapchat account, s4s2019clean.

12  Q.   And I just want to briefly walk through some of the other

13  sections in the report just so everybody gets a sense of what's

14  in here.

15         This section here that's called, "Installed

16  Applications (110)," what's the general data that's included in

17  this area?

18  A.   This is essentially just a table format.  The number sign

19  on the far left just shows the line number to be more easily

20  readable.

21         For this section the name is going to be the

22  installed application, the name of that installed application.

23         Description will include the version of that

24  installed application.

25         Within the timestamp you have the purchase date,

Zapolski – Direct

1   install date, last modified date, deleted date.  That just

2   indicates when that installed application was installed on the

3   phone.

4           Permissions is just the different applications that

5   are allowed to interact with this specific installed

6   application.

7   Q.   And under the "app usage" section, for instance on the

8   first line there is says 000000 in various places, is that --

9   based on the extraction process, does that information actually

10  indicate whether or not the app was used, or is that indicating

11  something else?

12  A.   Since they're all zeroed out, that essentially just means

13  that the phone has been power cycled.  It's been turned on and

14  off after we did the extraction -- or, I'm sorry, before we did

15  the extraction, which results in the zeros being there.

16  Q.   Okay.  Let's go to the next general section of the report

17  for "Searched Items."

18          And what general information is included in this

19  section of the report?

20  A.   So this section is the searched items.  This is the

21  information that the user actually searched for on the cell

22  phone.  Within this you have, again, just the number sign just

23  to denote the line number.

24          The timestamp shows when the search actually occurred

25  on the device.

1          The source would be essentially the application that
2   was used to make the search.
3          The value is what the user actually typed in within
4   the search box itself.
5   Q.   And the next section of this report is titled "User
6   Accounts".  And what does this section generally contain?
7   A.   Again, the number sign to denote each line, and then the
8   user accounts section will have the email address or the
9   username used for whichever type of account that the user
10  account is associated with.
11  Q.   And these are all user accounts that would have been
12  accessed on that phone, is that fair to say?
13  A.   Yes.  These are the -- yes, these are the email addresses,
14  the user account -- the user accounts, excuse me, that were
15  used on this specific device.
16  Q.   And the next section for "Web Bookmarks."  What sort of
17  general information is usually included in this section of the
18  report?
19  A.   Again the number sign to denote line.
20          The title is the actual website title.
21          The URL is the letters, the numbers that would need
22  to be placed within a web browser to get to that website.
23          The last visited is when the user last visited that
24  website.
25          The path is where this website is located on the

1  phone.

2  Q.  And the source information for -- is that just what

3  application was used to access that website if that's fair to

4  say?

5  A.  Yes.  That's the -- the source info is the web browser in

6  which this web bookmark is saved.

7  Q.  And how about the timestamps column?  What generally would

8  be included there?

9  A.  That means -- that denotes when the actual web bookmark

10  was created within the web browser.

11  Q.  So the next section, general section of the report, is

12  "Web History."  And what does this generally -- this section

13  generally show or contain?

14  A.  Similar to web bookmarks it has the number, the title of

15  the website, the url that is used to access the website, the

16  number of visits, the last visited.

17  Q.  Sometimes these columns -- are these columns sometimes

18  just not filled in when you do an extraction?

19  A.  Right.

20  Q.  Is there just because -- why is that sometimes?

21  A.  That can mean that either that -- that data type just

22  wasn't analyzed by the software.

23  Q.  And the next section then is "Data Files," if we could go

24  look at that general section of the report.  And what's

25  generally included in this part of the report?

Zapolski – Direct                                                109

1  A.   The data files are the pictures and videos that I included

2  within the PDF report.

3  Q.   And meaning that you included them because you determined

4  that they were child pornography in your opinion?

5  A.   Yes.  The data files represent the child pornography that

6  was located on the device.

7  Q.   And there's a number in parenthesis that's after the data

8  files.  What does that signify for this part of the report?

9  A.   The number of images that are within this section.

10  Q.   And what's the general kind of information, if you could

11  go through it, that's included in this table section of the

12  reports?

13  A.   Again, you have the number sign to denote what line is

14  there.

15         There's -- within the file info you have the name

16  which is the name of the file.  The path is the location that

17  that file was saved on the phone, as well as you can see below

18  that there's MD5.  That is a hash value, just a specific type

19  of hash value.

20         Within the additional file info is the size of the

21  file itself.

22         Within thumbnail you can see that it says, "Image

23  thumbnail was redacted."  I actually have the capability to

24  redact those smaller pictures out of this PDF just so it's not

25  represented in this format.  And then, again, the file name is

1  right below that redaction.

2          Deleted section would just show if the data file was

3  deleted or not from the device.

4          And then that small little tag all the way to the

5  right shows that I actually physically tagged this image within

6  Physical Analyzer to include in this PDF report.

7  Q.   So a couple things to talk about generally here then.  So

8  you mentioned the MD5, that being the hash value, so that long

9  string of letters and numbers is that digital fingerprint that

10 we talked about, that unique digital fingerprint?

11 A.   Yes.

12 Q.   And when you talked about redacting the thumbnail image,

13 first of all, what is a thumbnail image?

14 A.   A thumbnail image is essentially just a copy of an actual

15 image and it's smaller.

16 Q.   And in the process of Physical Analyzer telling it to

17 redact those images from this particular report, did that

18 change any of the data that was actually included in the

19 report?

20 A.   No.

21 Q.   It just removed the thumbnail, fair to say?

22 A.   Yes.

23 Q.   Was that simply done so that there would not be child

24 pornography in this report?

25 A.   Yes.

1  Q.   And with regards to the blue icon for tagging, you

2  mentioned that you put these tags in to select them for

3  inclusion in the report, I believe?

4  A.   Yes.

5  Q.   And when you did that, did that alter any of the sort of

6  underlying data in the report or in the data that you were

7  analyzing?

8  A.   No.

9  Q.   Was there subsequently also a tagged section of this

10 report that was just removed because it was primarily

11 duplicative information?

12 A.   Yes, it was.

13 Q.   Was there any data, aside from your tagging of those image

14 files or items, that was -- that is not included in this report

15 because we took that section out?

16 A.   Can you ask that again?

17 Q.   That was a confusing question.

18       So when we removed -- when you removed the section

19 for -- that involved the tags, what basic information is

20 usually included in the tag section?

21 A.   The tag section is essentially just going to duplicate the

22 information within this images field with the added information

23 of when I actually created the tag.

24 Q.   So that information was simply -- was that removed from

25 the report for purposes of making the report shorter?

1  A.    Yes.

2  Q.    But that -- removing that didn't alter any of the

3  underlying data, did it?

4  A.    No, it did not.

5  Q.    So we had discussed images of suspected child pornography

6  or images that you believed were child pornography on this

7  Coolpad, Exhibit 2A, correct?

8  A.    Yes.

9  Q.    And how many images did you find of child pornography on

10 this phone?

11 A.    Six.

12 Q.    What types of images were those?

13 A.    They were thumbnail images and cache images.

14 Q.    And we talked briefly about what a thumbnail image is.

15 For purposes of that report we talked about it.  What is a

16 thumbnail image for purposes of images that you might find on a

17 phone?

18 A.    So thumbnail -- an example of a thumbnail image would be

19 when a user opens up their gallery or where they have their

20 pictures and videos stored, they can scroll through all of

21 those, and they're smaller pictures and those are thumbnails.

22 Q.    And if a thumbnail -- depending on where you find the

23 thumbnail, can that sometimes provide you information with

24 where the full size picture is located on a phone?

25 A.    Yes.

Zapolski – Direct

113

1  Q.   Can you also sometimes find thumbnails on a phone even

2  though you don't find the actual full-size picture on the

3  phone?

4  A.   Yes.

5  Q.   And how can that happen?

6  A.   That happens when the original image that was within the

7  gallery is no longer on the phone for whatever reason.  The

8  thumbnail can still remain on the device.

9  Q.   So, for instance, if a user were to go in and delete a

10  picture, the thumbnail may -- might still exist on the phone?

11  A.   Yes.  The user can delete the picture from the gallery,

12  but the user can't access the thumbnail which shows that there

13  was that picture in the gallery at some point.

14  Q.   You also mentioned some of the pictures were cache images.

15  What does that mean?

16  A.   Cache images are essentially just temporary images that

17  are saved to the phone, which are copies of the actual image,

18  and the phone saves those to be able to easily access the

19  pictures in the future if the user needs to.

20  Q.   And is it possible that you might find cached images on a

21  phone while not finding the original full-sized picture that

22  was in the phone?

23  A.   Yes.

24  Q.   And why might that be again?

25  A.   Similar to thumbnails, when pictures are saved into a

1  gallery, a cache file is generated so the phone can pull up
2  that picture faster in the future.  Cache files can also be
3  created when the user is actively on the internet looking at
4  pictures, and that's not to say that the user is saving those
5  pictures from the internet, but cache files can still be saved
6  even if a user is looking at videos on the internet.
7  Q.   And can you -- is there anyway to tell whether an image --
8  an original image was actually saved in a gallery on the phone
9  versus potentially looked at online based on information that
10 you might obtain with regards to the cache image?
11 A.   Yes.
12 Q.   And what kind of information would allow you to tell that?
13 A.   The file path of the cache image would tell the examiner
14 where the actual image was saved on the phone.
15 Q.   Now, you stated that you found six images of child
16 pornography on the Coolpad phone.  Based on your training and
17 experience, were these all images of minors engaged in sexual
18 conduct?
19 A.   Yes.
20 Q.   Did any of the children appear to be prepubescent or under
21 the age of 12?
22 A.   Yes.
23        MS. NEE:  May I approach again?
24        THE COURT:  You may.  And, Ms. Nee, at some point I
25 think we'll take about a five-minute recess.

Zapolski – Direct                                                    115

```
 1              MS. NEE:  I think this would be a good time for that
 2   if we're inclined to do that.
 3              THE COURT:  We will -- Mr. Drabczyk is on it.  Please
 4   rise for the jury.
 5              (At 11:47 a.m., jury leaves.)
 6              THE COURT:  Record's closed.
 7              (At 11:48 a.m., break taken.)
 8              (At 11:55 a.m., break concluded.)
 9              (At 11:57 a.m., jury arrives.)
10              THE COURT:  Please be seated.  Ms. Nee, if you'd like
11   to continue with the witness.
12              MS. NEE:  Your Honor, may I approach?
13              THE COURT:  You may.  I assume you mean the witness?
14              MS. NEE:  The witness.
15              THE COURT:  All right.
16   BY MS. NEE:
17   Q.   Now, handing you what's been marked as exhibit 2C, 2D, 2E,
18   2F, and 2G.  Do you recognize these exhibits?
19   A.   Yes.
20   Q.   And how do you recognize them?
21   A.   These are the child pornography images located on the
22   Coolpad cell phone.
23   Q.   Are they a true and accurate depiction of the images that
24   you saw in the data extracted from the Coolpad cell phone?
25   A.   Yes, ma'am.
```

Zapolski – Direct                                                116

 1              MS. NEE:  I move to admit these exhibits.

 2              MR. RUPP:  No objection, Your Honor.

 3              THE COURT:  Received.

 4  BY MS. NEE:

 5  Q.   Could you please turn to the image marked as Exhibit 2C,

 6  and can you describe this image for the record.

 7  A.   This is a female child with a penis near her face.

 8  Q.   And is -- are you able to determine an approximate age for

 9  this child?

10  A.   I would say less than 10.

11  Q.   Is it a relatively small-sized picture?

12  A.   Yes, it is.

13  Q.   And what type of image was that, if you recall?

14  A.   I don't recall.

15  Q.   Is it safe to say that it looks like a thumbnail-sized

16  image?

17  A.   Yes, I believe it's a thumbnail.

18              MS. NEE:  Your Honor, at this point in time we would

19  request permission to publish to the jury the image in

20  Exhibit 2C for three seconds, after which time we will take it

21  down.

22              THE COURT:  You may.

23              (Exhibit 2C displayed.)

24  BY MS. NEE:

25  Q.   Was this an image that you found on the Coolpad device

1   that was located on Justin Zube's bed in his bedroom?

2   A.   Yes.

3   Q.   Would there be more information relating to this picture

4   in the Cellebrite report for Exhibit 2A that we previously

5   reviewed?

6   A.   Yes.

7   Q.   If we could pull up Exhibit 2B, please.  I'd like to go to

8   the section on data files that we looked at previously.  You

9   previously talked about the types of information included in

10  this section of the report.  Is line 1 the line that

11  specifically deals with the image that we just saw in

12  Exhibit 2C?

13  A.   Yes.

14  Q.   And what does the information in line 1 tell you about

15  this image and where it was located?

16  A.   The name of the file is "thumbdata" and the file path has

17  "thumbnails" within, which makes me believe that this is a

18  thumbnail image.  And also within the file path, you can see

19  that there are the letters D-C-I-M, and that is the gallery of

20  the phone.

21          After DCIM you can see that there is a -- the word

22  dot thumbnails -- or there's a period and then thumbnails, and

23  that is significant because that is the thumbnails folder for

24  the images that were saved within the gallery of the phone.

25  Q.   So you previously had indicated that sometimes thumbnails

 1   might be created when a person is looking at something on the

 2   internet and sometimes they can be created when a person saves

 3   something on their phone; is that correct?

 4   A.   Yes.

 5   Q.   And in this case, what -- what occurred with this

 6   particular image based on the information included here?

 7   A.   This original image was at one point saved in a gallery of

 8   the phone.

 9   Q.   Did you also find a copy of this image that was visually

10   similar to this image on another device that you reviewed in

11   this case?

12   A.   Yes.

13   Q.   I'd like now to turn your attention to Exhibit 2D.  Can

14   you describe this image for the record.

15   A.   This is a closeup on a prepubescent vagina, and there is a

16   purple sex toy penetrating the vagina.

17   Q.   And you mentioned prepubescent, what basis did you use to

18   make that determination?

19   A.   There's no pubic hair on this vagina.

20          MS. NEE:  At this point, I'd like to publish the

21   image to the jury for three seconds, after which we'll take it

22   down.

23          THE COURT:  Yes, ma'am.

24          (Exhibit 2D displayed.)

25   BY MS. NEE:

1  Q.    If we could return to Exhibit 2B, the report for this

2  Coolpad cell phone.  Is line 2 the line that refers to this

3  image?

4  A.    Yes.

5  Q.    And what does this line tell you about the image?

6  A.    Just like the last image, this was a thumbnail that was

7  saved on the phone, which means that a larger version of this

8  picture was at one time saved in the gallery of the phone.

9  Q.    I'd like to now turn to Exhibit 2E, and can you describe

10  this image for the record, please.

11  A.    This depicts a female child, possibly around 10 years old.

12  She's nude from the waist down and she is manipulating her

13  vagina with her fingers.

14          MS. NEE:  I'd like to now publish this image to the

15  jury for approximately three seconds.

16          THE COURT:  Yes.

17          (Exhibit 2E displayed.)

18  BY MS. NEE:

19  Q.    And returning to your report on the Coolpad cell phone, is

20  line 3 the line that deals with that image that we just saw in

21  Exhibit 2E?

22  A.    Yes.

23  Q.    What data -- or what information do you get from the data

24  included in line 3 in this report?

25  A.    You can see that the -- within the file path there is the

Zapolski - Direct

120

1    cache folder, which is then within the simple mobile tools

2    gallery folder, which means that this image is a cache image

3    which is a copy of an actual image that was previously saved in

4    the gallery.

5    Q.   Again, its location in this particular file path, which is

6    under simplemobiletools.gallery means that this is a cache

7    image for an image that was saved on the phone versus seen on

8    the internet, for example?

9    A.   Yes.

10   Q.   Did you also find a copy of an image that was visually

11   similar to this image on another device in this case?

12   A.   Yes.

13   Q.   I'd like to now turn your attention to Exhibit 2F, and can

14   you describe this image for the record.

15   A.   This depicts a prepubescent female child, possibly a

16   toddler, nude.  There is a finger entering the child's anus.

17           MS. NEE:  I'd like to now publish this image to the

18   jury for approximately three seconds.

19           (Exhibit 2F displayed.)

20   BY MS. NEE:

21   Q.   Returning to your report in Exhibit 2B, is line 4 the line

22   that deals with the image that we just saw in Exhibit 2F?

23   A.   Yes.

24   Q.   And what does the information in this line tell you about

25   the image that we just saw?

1   A.   Again, this is a cache file image.  You can see cache

2   was -- is within the file path.  Simple mobile tools also

3   appears within the file path, which means that this -- a copy

4   of this image was at one point saved in the gallery of the

5   phone.

6   Q.   Now, I'd like to talk about the information in the next

7   column over for this item.  There's some information regarding

8   created, modified, accessed dates for this -- this picture,

9   what do those signify in this case?

10  A.   That's when the image was created on the device itself.

11  Q.   And does that -- the image, meaning the cache image, was

12  created?

13  A.   Yes.

14  Q.   And does that tell you anything about the presence of the

15  original image on the phone?

16  A.   Yes.  That's when the original image was also created.

17  Q.   And by created in -- with respect to the original image,

18  is this what you spoke about earlier where it was saved into

19  the gallery of the phone?

20  A.   Yes.

21  Q.   Just returning briefly to the line above that in line 3,

22  which was the image we saw before the last image.  Did that

23  also have some date information associated with it?

24  A.   Yes.

25  Q.   Indicating December 18th of 2019, and is that the same

 1  situation then with regards to the creation of the cache and

 2  the under -- and the saving of the underlying image?

 3  A.   Yes.

 4  Q.   All right.  I'd like to now turn your attention to Exhibit

 5  2G, which is the last image we will see on this phone.  Could

 6  you please describe this image for the record.

 7  A.   This image depicts a nude prepubescent female child,

 8  possibly a toddler.  She is nude.  There is an adult hand

 9  visible in the image manipulating her vagina.

10          MS. NEE:  Can we publish this to the jury now for

11  approximately three seconds.

12          (Exhibit 2G displayed.)

13  BY MS. NEE:

14  Q.   Returning to your report in Exhibit 2B, is line 5 the line

15  that corresponds with this image on the Coolpad phone?

16  A.   Yes.

17  Q.   And what does this line tell you about the image that we

18  just saw?

19  A.   Again, like the last image, it is a cache image.  You can

20  see simple mobile tools gallery within the file path as well as

21  the cache folder within that file path.

22  Q.   Is there also associated date information here?

23  A.   Yes.

24  Q.   What does -- what is that date information and what does

25  it signify?

Zapolski - Direct

1  A.    When the image was saved to the phone.

2  Q.    Was that December 18th of 2019?

3  A.    Yes.

4  Q.    I'd like to move now from showing images on the Coolpad

5  phone to looking at some other sections of the report for the

6  Coolpad phone in Exhibit 2B.

7          We previously looked at some of the sections of this

8  report in an overview fashion.  I'd like now to talk about some

9  specifics of what you found in these sections of the report.

10          So under the installed applications section, I'd like

11  to direct your attention to line 33.  Let's start with line 38,

12  actually.  What does this line tell you?

13  A.    This lines shows that Snapchat was an installed

14  application on this device.  It was installed on November 13th,

15  2019.

16  Q.    And what, again, was the significance of Snapchat with

17  respect to your investigation in this case?

18  A.    Snapchat was the application originally reported by the

19  National Center for Missing and Exploited Children.

20  Q.    You mentioned that it was installed on the phone and

21  there's a purchase date associated with it.  Would the internet

22  have been required in order to download Snapchat to this

23  cellular phone?

24  A.    Yes.

25  Q.    And moving now to line 33, what is the application that is

Zapolski - Direct

1  referenced in line 33?

2  A.    Snapsaver.

3  Q.    And in the course of the investigation, did you learn more

4  about the application Snapsaver?

5  A.    Yes.

6  Q.    What is it?

7  A.    It is a screen recording application.

8  Q.    When you talk about a screen recording application, what

9  do you mean by that?

10  A.    This application allows the user to take pictures of

11  whatever is on the screen as well as record videos of whatever

12  is playing on the screen.

13  Q.    By "on the screen" you mean on the screen of the phone in

14  which the application is installed, is that fair?

15  A.    Yes.

16  Q.    And were you able to determine anything about how the

17  application works in general to do that?

18  A.    Can you say that again?

19  Q.    Were you able to determine anything about how the user

20  uses the application in general to record things?

21  A.    Yes.  The user would essentially open the application,

22  press the record button, which would initiate a recording, and

23  then do whatever activity on the phone and then end the

24  recording and then that video would be saved.

25  Q.    And during that process, the recording that is saved would

Zapolski – Direct

1    be a recording of what was occurring or what was visible on the

2    phone screen at that time?

3    A.    Yes.

4    Q.    Would the recordings from Snapsaver have been saved in any

5    particular location on a phone?

6    A.    Yes.   The videos from Snapsaver, the recordings that the

7    user did themselves, would be saved in the Snapsaver folder

8    within the filed path.

9    Q.    And in this particular line 33, what does this tell you

10   about Snapsaver in this particular phone?

11   A.    That it was installed on the phone on November 13th, 2019.

12   Q.    Would the internet have been required as part of this

13   process to install Snapsaver on the phone?

14   A.    Yes.

15   Q.    I would like to move to the searched items section of the

16   report.   Specifically if we can look at line 65.

17           What does this line tell you?

18   A.    Line 65 shows that the user searched for Snapchat within

19   the Google Play store.

20   Q.    Does it indicate also the date in which that search was

21   done?

22   A.    Yes.

23   Q.    What date was that?

24   A.    November 13th, 2019.

25   Q.    Was that the same date on the date in which it was

Zapolski — Direct

1  indicated to have been installed on the phone?

2  A.   Yes.

3  Q.   What about line 64 on top of that, what does that line

4  tell you?

5  A.   It shows that on November 13th, 2019, the user searched

6  within the Google Play store for Snapsave for Snapchat.

7  Q.   Was that also on November 13th of 2019?

8  A.   Yes.

9  Q.   Was that the same date in which that application was

10 indicated it was installed on the phone?

11 A.   Yes.

12 Q.   You indicated that the user searched within the play

13 store.  What is that?

14 A.   The Google Play store is the location where Android users

15 can install applications on their device.

16 Q.   And also to conduct a search in the Google Play store to

17 look for an application, would the internet have been required?

18 A.   Yes.

19 Q.   You talked about the presence of Snapchat and Snapsaver on

20 this phone, Exhibit 2A, the Coolpad.  Were these apps,

21 applications, also found on other phones that you analyzed for

22 this case?

23 A.   Yes, the two other phones admitted into evidence.

24 Q.   Meaning that both applications were found on both of those

25 other phones?

Zapolski - Direct

1   A.    Yes.

2   Q.    Okay.  Looking at the user accounts that -- in Exhibit 2B,

3   line 2 indicates s4s2019dirty@gmail.com; is that correct?

4   A.    Yes.

5   Q.    What does this line tell you with respect to that

6   username?

7   A.    That that email address was used for a Dropbox account.

8   Q.    And would that have been done on this phone, then?

9   A.    Yes.

10  Q.    And based on your experience, does s4s mean anything to

11  you?

12  A.    It can stand for several different things.  In my

13  experience, it's either shout out for shout out, support for

14  support, or share for share.

15  Q.    And did the actual username s4sdirty2019 have any

16  significance to you with respect to your prior investigation in

17  the case?

18  A.    Yes.

19  Q.    What was that?

20  A.    It's similar to the original username reported by Snapchat

21  in the original NCMEC tip.

22  Q.    What was that original username?

23  A.    S4s2019clean.

24  Q.    In general, as we're going through these user accounts on

25  the Coolpad phone, what is the significance of some of the user

1  account information that we're going to see in terms of your

2  investigation, generally?

3  A.   Can you rephrase that?

4  Q.   In identifying certain user account information that we

5  are going to talk about during the course of your testimony

6  today, what's the significance of the specific user account

7  that you have identified to talk about?

8  A.   It helps to identify who actually uses the phone.

9  Q.   And were there also times when user accounts were the same

10 between phones?

11 A.   Yes, that is correct.

12 Q.   So I'd like to move to line 5 if I could.  What does this

13 line indicate about the user application that's listed there?

14 A.   Line 5 shows that the username Showmeyourxxx was used for

15 a Reddit account on this phone.

16 Q.   And was this log in used on any other phones that you

17 found in your investigation?

18 A.   Yes.

19 Q.   How about line -- if we go to line 112.  What's shown here

20 and what's the significance of that?

21 A.   Line 112 shows that the email address

22 bmxryder2001@gmail.com was used for Gmail on this phone?

23 Q.   Was used meaning -- does that mean it was used to log into

24 Gmail on the phone?

25 A.   Yes.

Zapolski – Direct

1  Q.   And was this email address login also seen -- or was the

2  Gmail address itself also seen on other devices in this case?

3  A.   Yes.

4  Q.   I'd like to go to line 114.  What does this line tell us?

5  A.   That shows that the phone number (989)443-0206 was used

6  for MMS, which is picture messages on this phone.

7  Q.   And did you recognize that phone number from elsewhere --

8  A.   Yes.

9  Q.   -- in this investigation?

10       And what was the significance of that phone number?

11 A.   That is the phone number that belongs to Mr. Zube.

12 Q.   Line 117, please.  What does this line indicate?

13 A.   This line is the username flyryder4life, and that was used

14 on Instagram on this device.

15 Q.   Was this is also used for Instagram on any other devices

16 in this case?

17 A.   Yes.

18 Q.   Line 120, please.  What does this line tell us?

19 A.   This shows that the username almost underscore reality was

20 used for a Twitter account through the web browser Chrome, and

21 the password to that the account is almost1987#.

22 Q.   And you previously indicated there was a significance to

23 the numbers 1-9-8-7, what was that in respect to this case?

24 A.   That's Mr. Zube's date of birth -- or his year of birth,

25 excuse me.

Zapolski - Direct

130

1   Q.   Line 121, please.  What does this line tell us?

2   A.   It shows that the Gmail address bmxryder2001@gmail was

3   used for an account on the website usachatnow.com and the

4   password to this account was justin1987#.

5   Q.   And what was the significance of this password with

6   respect to this investigation?

7   A.   Justin is Mr. Zube's first name and 1987 is his year of

8   birth.

9   Q.   How about line 124, please.  What does this line tell us?

10  A.   This shows that an account live was logged into on this

11  phone through the web browser Chrome, and the password was

12  zoob1987#, and zoob is spelled Z-O-O-B.

13  Q.   What was the significance of this password for this

14  investigation?

15  A.   Zoob is similar to Mr. Zube's last name; 1987 is his year

16  of birth.

17  Q.   Line 125, please.  What does this line tell us?

18  A.   That shows that the username Zoobzilla was used for an

19  account on bethesda.net and the password was Bet1987#.

20  Q.   Line 129, please.  What does this line tell us?

21  A.   The username still underscore trippin was used on the

22  website fetlife.com and the password was justin1987#.

23  Q.   Line 139, please.  What does this line tell us?

24  A.   It shows that the email address

25  lilredheadcutie2019@gmail.com was used for a Dropbox account on

Zapolski — Direct

1  this device, and the password was drop1987#.

2  Q.  And did you see this Gmail account on other phones on at

3  least one other phone in this investigation?

4  A.  Yes.

5  Q.  Line 140, please.  What does this line tell us?

6  A.  This shows that the username s4s2019clean was used for

7  Snapchat on this device and the password is the letters

8  cle1987#.

9  Q.  And what was the significance of s4s2019clean as the

10 username for Snapchat again?

11 A.  This is the Snapchat account that was originally reported

12 in the NCMEC tip.

13 Q.  Line 141, please.  What does this line tell us?

14 A.  This shows that the username s4s2019dirty was also used on

15 Snapchat on this device and the password was dir1987#.

16 Q.  Line 140, please.  What does this tell us?

17 A.  The username almost underscore reality was used for a

18 Snapchat account on this device, and the password was alm1987#.

19 Q.  And did you see this username also on any other devices in

20 this investigation?

21 A.  Yes.

22 Q.  Line 143, please.  What does this line tell us?

23 A.  The username pedro4prez was used on the website

24 fetlife.com and the password was pedro1987#.

25 Q.  And did you see this username on any other device in this

1  investigation?

2  A.    Yes.

3  Q.    Line 147, please.  What does this line tell us?

4  A.    The username 9897171819 was used to log into a Facebook

5  account on this device, and the password is 118slincoln.

6  Q.    And what is the significance of this user -- well, of the

7  password I suppose?

8  A.    That is Mr. Zube's home address.

9  Q.    Line 165, please.  What does this line tell us?

10 A.    That the Facebook user Justin William was logged into on

11 this phone and the email address associated with this Facebook

12 account is justinwilliam198 @gmail.com.

13 Q.    If you scroll to the bottom of that line, there's a phone

14 number listed there.  Do you recognize that phone number?

15 A.    Yes.

16 Q.    And what is it?

17 A.    Phone number is (989)443-0206.

18 Q.    And what was that phone number in the course of the

19 investigation?

20 A.    Mr. Zube's phone number.

21 Q.    And what, again, was Mr. Zube's middle name?

22 A.    William.

23 Q.    Line 166, please.  What does this tell us?

24 A.    The username j.william.1987 with the account name Justin

25 William was used for a Facebook account.

1   Q.    And is there also information about email associated with

2   this account?

3   A.    The email justinwilliam1987@gmail.com is the associated

4   email address.

5   Q.    If we scroll to the bottom of that line, is there also the

6   phone number (989)443-0206 associated with this Facebook

7   account, as well?

8   A.    Yes.

9   Q.    And was that the same number that we previously discussed

10  at Mr. Zube's phone number?

11  A.    Yes.

12  Q.    I'd like to move to the web bookmarks section of this

13  report again.  Typically in your experience, I guess in

14  general, why do people create web bookmarks?

15  A.    To get back to a website faster.

16  Q.    I'd like to look at line 1.  Could you read the title of

17  that web bookmark, please.

18  A.    The title of this web bookmark is "NoNudeVille Web Albums

19  hyphen NN Models, Preteens, Modeling Sites, Preteen Girl, Young

20  cuties, Little girls, number signs."

21  Q.    Is there number signs at the beginning as well?

22  A.    Yes.

23  Q.    And what is the significance of the title of this

24  particular web bookmark?

25  A.    The title has preteen girl, young cuties.

Zapolski - Direct

```
1   Q.   Are there also preferences to no nude and NN which you

2   described previously?

3   A.   Yes.

4   Q.   And did you testify earlier that those have significance

5   with respect to child pornography investigations?

6   A.   Yes.

7   Q.   And what was that significance again?

8   A.   That people interested in child pornography would visit

9   non-nude websites because they believe typically that it would

10  be legal images of children.

11  Q.   And is there a date associated with this bookmark?

12  A.   Yes.

13  Q.   What was this?

14  A.   August 28th, 2019.

15  Q.   And you testified earlier that that date in that column

16  would be the date when the bookmark was created; is that

17  correct?

18  A.   Yes.

19  Q.   I'd like to look at line 30, please.  What does this line

20  indicate as the title and web address for this bookmark?

21  A.   The title of this website is "Art gallery of nonude teen

22  girls," and the url is preteen-art.vip.

23  Q.   Is there also an associated date for the creation of this

24  bookmark?

25  A.   Yes, August 28th, 2019.
```

1  Q.   I'd like to look at line 63, please.  What does this line

2  tell us?

3  A.   The title of this website is "Kiddy World."

4  Q.   And was this also a bookmark that has an associated

5  creation date?

6  A.   Yes, August 30th, 2019.

7  Q.   Line 68, please.  What does this bookmark have as a title

8  and as a web address, please?

9  A.   The title of this website is "Ls Bbs Nude Pics Nude, Nude

10 Picture HD," and the url is pekbook.com/girlspic/ls-bbs-nude.

11 Q.   You previously discussed what LS Signifies with respect to

12 child pornography investigations; is that correct?

13 A.   Yes.

14 Q.   And can you remind us what LS means?

15 A.   LS Is short hand for Lolita Studios, which was a popular

16 modeling agency in Eastern Europe which specialized in

17 children.

18 Q.   That would eventually involve series of images, I think

19 you testified earlier, where the children would end up nude?

20 A.   Yes.

21 Q.   And line 120, please.  What is the name or title of the

22 website in line 120?

23 A.   "TweenGirls.co - The Hebe Jailbait Forum."

24 Q.   You previously discussed the meaning of hebe in the

25 context of child pornography investigation; is that correct?

Zapolski – Direct                                                136

1  A.    Yes.

2  Q.    What was -- what was the significance of H-E-B-E?

3          MR. RUPP:  Judge, at this point I'm just going to

4  place an objection to there's a lot of questions that are asked

5  and answered.  They're prefaced by, you've already answered

6  this, can you tell us again.

7          MS. NEE:  I can try to minimize that.  We're just

8  trying to make sure the jury recalls the prior testimony.

9          THE COURT:  If we can edit a bit prospectively for

10  redundancy, it would be helpful.

11          MS. NEE:  Certainly.

12  BY MS. NEE:

13  Q.    And what was the -- what -- we haven't discussed the term

14  "tween" previously.  Are you familiar with that term tween?

15  A.    Yes.

16  Q.    What does that generally refer to?

17  A.    Typically a preteen child.

18  Q.    Can we look at line 128, please.  What does this line tell

19  us?

20  A.    The title of this website is, "Young nonude girls -

21  paradise of hot teen models," and the url is

22  preteen-angels.vip.

23  Q.    How about line 129 under that?

24  A.    The website title is "Young Teen Models 11-15," and the

25  url is first-nonude.com.

1  Q.   Again, these were all in the bookmark section of the

2  report, correct?

3  A.   Yes.

4  Q.   And could we look at the web history now, please.  Line

5  16, please.

6        The title Young Teen Models 11 to 15, was this seen

7  elsewhere in the report in a different section?

8  A.   The bookmarks.

9  Q.   And being in web -- the web history section now, what does

10 that signify?

11 A.   That the user actually visited that website.

12 Q.   Can we see lines 25 and 26, please.  Specifically line 26,

13 is this also -- what's the significance of this line here in

14 the web history?

15 A.   That the user visited the website.

16 Q.   Was this a line that was included -- or was this a website

17 that was also included in the bookmarks?

18 A.   Yes.

19 Q.   Line 29, please.  What was the website visited here?

20 A.   "Ls Bbs Nude Pics Nude Nude Picture HD."

21 Q.   And lines 31 and 32, below that, what were the websites

22 visit there?

23 A.   Thirty-one is "Young nonude girls paradise of hot teen

24 models," and line 32 is "Art gallery of nonude teen girls."

25 Q.   And line 49, what was the website that was visited here?

1    A.    "TweenGirls.co - The Hebe Jailbait Forum."

2    Q.    And line 62, please.  What was the website visit here?

3    A.    This website title is "Kiddy World."

4    Q.    Just returning to the bottom of the report again and the

5    database images section.  You had indicated that you had found

6    six images that you believed to be child pornography on this

7    phone.  We looked at five of those images here.  I just want to

8    visit the sixth image line.

9          And just looking at that file path, again, what does

10   that file path tell you about this particular image?

11   A.    It's a cache file that's specifically a gallery cache

12   file.

13   Q.    So this is an image that you believe to be child

14   pornography but we did not show the jury; is that correct?

15   A.    Yes.

16   Q.    All right.  I'd like to move to the second phone, which

17   was Exhibit 3A.  Did you also conduct a forensic examination of

18   this phone?

19   A.    Yes.

20   Q.    And were you able to extract all of the data on this phone

21   or only part of the data, or how did that process go?

22   A.    I was only able to get a basic extraction on this phone.

23   Q.    Did you create an initial report using Cellebrite that

24   included data from this phone as well?

25   A.    Yes.

1  Q.   Did you -- what information was included in that report in

2  general?

3  A.   User accounts, images, videos.

4  Q.   Was there -- was there any web bookmarks or web history

5  included in this report?

6  A.   I don't believe so.

7  Q.   And did you also work on a shorter excerpt of that -- of

8  this report in the same process that you did for the previous

9  record we saw on Exhibit 2B?

10 A.   Yes.

11 Q.   Did you change any of the database in the original report

12 in order to create this excerpt?

13 A.   No.

14 Q.   I'd now like to approach and show you Exhibit 3B, please.

15       I'm handing you Exhibit 3B.  Do you recognize this?

16 A.   Yes.

17 Q.   What is it?

18 A.   It's my findings report for this device?

19 Q.   Did you again add some highlighting to this report to

20 assist in indicating what you're talking about while you're

21 conducting your testimony?

22 A.   Yes.

23 Q.   Otherwise, to what was previously discussed, is the data

24 that's included in Exhibit 3B substantially the same as the

25 data from the underlying cell phone Exhibit 3A?

 1  A.    Yes.

 2              MS. NEE:  I'd move to admit Exhibit 3B, please.

 3              MR. RUPP:  No comment.

 4              THE COURT:  It's received.

 5  BY MS. NEE:

 6  Q.    Again, we're looking at this report.  Does this report

 7  basically follow the same format and structure in general as

 8  the previous report we saw?

 9  A.    Yes.

10  Q.    And this is the summary section we're seeing here, and you

11  input certain information in here, did you?

12  A.    Yes.

13  Q.    What information did you input with respect to this

14  report?

15  A.    The examiner name, location, case number, cases name and

16  department.

17  Q.    Similar to the other report, did you input any other

18  information into this report?

19  A.    There may be tags in this report as well.

20  Q.    Look at the source extraction section for this.  Does this

21  tell us what the device name was?  I believe under "selected

22  device name" it says LGL158VL Rebel 3.

23  A.    That's correct.

24  Q.    And is that the device then that was the -- for Exhibit

25  3A?

1  A.   Yes.

2  Q.   If we look towards the bottom of this excerpt that we're

3  seeing and it says, "Extraction file data integrity, intact;"

4  is that correct?

5  A.   Yes.

6  Q.   What does that mean for this particular data file?

7  A.   That the data was not changed.

8  Q.   Under the device information section, the "Detected

9  manufacturer" it says "lge".  What does this tell you about the

10  brand of the particular device?

11  A.   That it's an LG cell phone.

12  Q.   Now, as part of your forensic examination of the data on

13  the cell phone Exhibit 3E, did you review that phone for images

14  of child pornography?

15  A.   Yes.

16  Q.   How many images did you find on this phone?

17  A.   Seventy-four.

18  Q.   What types of images were these?

19  A.   Cache images.

20  Q.   Based on your training and experience, were all of these

21  images that you identified images of minors engaged in sexually

22  explicit conduct or with a lascivious depiction of genitalia or

23  pubic area?

24  A.   Yes.

25  Q.   And did any of the children appear to be prepubescent or

 1  under the age of 12?

 2  A.    Yes.

 3              MS. NEE:  Judge, approach again, Your Honor?

 4              THE COURT:  Yes, ma'am.

 5  BY MS. NEE:

 6  Q.    I'm handing you what's been marked as Exhibit 3C, 3D, 3E,

 7  3F, and 3G.  Could you please turn to Exhibit 3C and describe

 8  this image for the record.

 9  A.    It depicts a female child with a penis near her face.

10  Q.    And was this image visually similar to an image that we

11  saw previously?

12  A.    Yes.

13  Q.    And that prior image, was that on Exhibit 2A, the Coolpad

14  then?

15  A.    Yes.

16              MS. NEE:  At this point, we would publish the image

17  to the jury for approximately three seconds.

18              (Exhibit 3C displayed.)

19  BY MS. NEE:

20  Q.    Returning to the report, Exhibit 3B, is line 27 the line

21  that deals with the image that we just saw?

22  A.    Yes.

23  Q.    And what does the path information here tell you about

24  where this image was located?

25  A.    Again, you can see cache within the file structure.

1   Before cache you can see that the words

2   "com.android.gallery3d," are there, and that means that this

3   image was a cache file of something saved in the gallery of the

4   phone.

5   Q.   Returning just briefly administratively, with regards to

6   the images that I showed you, or that I handed to you

7   previously, I believe 3C to 3G, are these a true and accurate

8   depiction of the images that you saw in the data that was

9   extracted from the LG cell phone that was next to Mr. Zube's

10  bed in Mr. Zube's bedroom?

11  A.   Yes.

12          MS. NEE:  I'd move to admit exhibits 3C to 3G,

13  please.

14          MR. RUPP:  No objection.

15          THE COURT:  They are received.

16  BY MS. NEE:

17  Q.   Returning to the report, you were discussing the location

18  in the Android gallery cache; is that correct?

19  A.   Yes.

20  Q.   So in your -- based on your training and experience, was

21  this an image that was -- could you tell whether this was an

22  image that was merely viewed on the internet versus saved on

23  the phone?

24  A.   Yes, this was previously saved on the phone.

25  Q.   I'd like to turn to Exhibit 3D, please.  Can you describe

1  this image for the record.

2  A.   This is a female child nude from the waist down,

3  manipulating her vagina.

4  Q.   Is this image visually similar to an image that you saw on

5  another device?

6  A.   Yes.

7  Q.   Is that the device that we were looking at previous to

8  this device?

9  A.   Yes.

10  Q.   So is that Exhibit 2A on the Coolpad?

11  A.   Yes.

12         MS. NEE:  At this point we would publish the image to

13  the jury for three seconds.

14         (Exhibit 3D displayed.)

15  BY MS. NEE:

16  Q.   Returning to your report Exhibit 3B, is line 31 the line

17  that deals with the image that we just saw?

18  A.   Yes.

19  Q.   And what does this line tell you about the image?

20  A.   Just like the last image, it was a cache file associated

21  with the gallery of the phone.

22  Q.   And based on that information, where would the original

23  image have been?

24  A.   In the gallery.

25  Q.   Let's look at Exhibit 3E.  I won't show it yet.  Can you

1   describe this image for the record, please?

2   A.   This is a nude female child, possibly a toddler.  She is

3   being anally penetrated by an adult male.

4            MS. NEE:  At this point we would publish the image to

5   the jury for approximately three seconds.

6            (Exhibit 3E displayed.)

7   BY MS. NEE:

8   Q.   Returning to your report, is line 36 the line that deals

9   with the image that we just saw in Exhibit 3E?

10  A.   Yes.

11  Q.   What does this line tell us about that image?

12  A.   Same as the last.  It was a cache image.  The original

13  image was previously saved within the gallery.

14  Q.   If we could look at Exhibit -- or if you could turn your

15  attention to Exhibit 3F, please.  Could you describe this image

16  for the record.

17  A.   This is a three-by-two image depicting the same female

18  child, nude from the waist down, she's prepubescent, an adult

19  penis is penetrating her vaginally or anally.

20  Q.   Is there also a part of the image that includes some

21  additional data regarding the child's vagina?

22  A.   Can you rephrase?

23  Q.   Yeah.  In one of the images, is there a substance that can

24  be seen on the child's vagina?

25  A.   Yes.  There's a white substance coming from the female's

Zapolski - Direct

1  vagina.

2          MS. NEE:  At this point, we would publish the image

3  to the jury for approximately three seconds.

4          (Exhibit 3F displayed.)

5  BY MS. NEE:

6  Q.    Returning to your report in Exhibit 3B, is line 20 the

7  line that deals with that image?

8  A.    Yes.

9  Q.    And what does this line tell us about the image?

10 A.    Same as the others.  It was a cache file, the original

11 image was previously saved within the gallery of the phone.

12 Q.    Did you see an image that was in part visually similar to

13 this image on a different phone?

14 A.    No, I don't believe so.

15 Q.    Okay.  Could you please turn to Exhibit 3G and describe

16 this image for the record, please.

17 A.    This is a two-by-three image displaying two full pic --

18 or, excuse me, four full pictures and two partial pictures.

19 The top two images depict children.  In one of the pictures an

20 adult is seen manipulating a nude female child's vagina.

21          In the picture on the right, a toddler female, nude

22 from the waist down is being anally penetrated by an adult

23 male.

24          MS. NEE:  At this point we would publish the image to

25 the jury for approximately three seconds.

Zapolski – Direct

1           (Exhibit 3G displayed.)

2    BY MS. NEE:

3    Q.   Returning to your report in Exhibit 3B, is line 43 the

4    line that deals with this image?

5    A.   Yes.

6    Q.   And what does this line tell you about the image?

7    A.   Same as the others; it was a cache image.  The original

8    image was previously saved within the gallery.

9    Q.   Did you also find other images besides these five images

10   which were shown to the jury, which you believed were also

11   child pornography?

12   A.   Yes.

13   Q.   And to be specific that is on this phone, Exhibit 3A, you

14   found additional images that you believed to be child

15   pornography?

16   A.   Yes.

17   Q.   And is the data associated with these images in the data

18   files section of your report as well?

19   A.   Yes.

20   Q.   And right now we are -- if we could look at some of those

21   images or some of that data.  Is that approximately between

22   pages 4 and 12 of your report, approximately?

23   A.   I believe so.

24   Q.   And were these items found in the same cache folder as the

25   five images that we looked at?

Zapolski - Direct

1  A.    Yes.

2  Q.    I'd like to now move from showing the images that were on

3  Exhibit 3A, which was the phone next to the bed, and look at

4  some other sections of the report for that phone.   Starting

5  with the installed applications, line 2, what does this tell

6  you?

7  A.    The application Snapchat was installed on this device.

8  Q.    And what about line 4?

9  A.    Snapsaver was also installed on this device.

10 Q.    Were these two applications also installed on other

11 devices that you -- out of the three that were admitted into

12 evidence?

13 A.    Yes.

14 Q.    If we move to the user accounts now on this phone.   What

15 are the two user accounts that are shown here?

16 A.    Almost Reality was used for a Snapchat account, and the

17 username flyryder4life was used on Instagram.

18 Q.    On the phones that we've seen so far, we've talked about

19 thumbnails and cache images; is that correct?

20 A.    Yes.

21 Q.    And you indicated that these, I believe, are created --

22 based on the locations that you found those files in, that

23 those were created when images were saved into galleries?

24 A.    Yes.

25 Q.    Did you find the actual original images on these phones

Zapolski - Direct

149

1  for those images?

2  A.    No.

3  Q.    And based on your experience, what -- what might be a

4  reason for that?

5  A.    It's possible that the user deleted them from the phone.

6  Q.    In your experience, in these types of investigations, is

7  it common that you might find -- or frequently anyways does it

8  happen, that you only find cache images but not the original

9  images?

10  A.    Yes.

11  Q.    And why is that?

12  A.    By deleting images is a way to remove the evidence.  It's

13  also possible, I've seen in my experience, that users sometimes

14  store their child pornography files on cloud services, meaning

15  that they don't have to save it onto their device.

16  Q.    I'd like now to move to your examination of Exhibit 4A.

17  Is that the cell phone which was found in the top dresser

18  drawer of Mr. Zube's bedroom?

19  A.    Yes.

20  Q.    What type of an extraction were you able to perform for

21  Exhibit 4A?

22  A.    4A was a full extraction, physical.

23  Q.    And did you also create a report for Exhibit 4A following

24  the same processes that we described earlier?

25  A.    Yes.

1  Q.   Did you also create a shorter version of that report using

2  the same processes we discussed earlier.

3  A.   Yes.

4  Q.   Did you also apply highlighting to this report in the same

5  manner that you applied highlighting to the other two reports?

6  A.   Yes.

7           MS. NEE:  I am going to approach now and provide you

8  with Exhibit 4B.

9           THE COURT:  Ms. Nee, it's nearing 1:00.  If there's a

10 point in your examination where it would be efficient to break,

11 I'd ask you to see if you can locate it.

12          MS. NEE:  This is actually a good time for us to do

13 that if that's amenable to the Court.

14          THE COURT:  Very good.  We'll see if we can hail

15 Mr. Drabczyk.

16          That will be the last of your service for the jury

17 for the day.  One thing I would remind you, because we've been

18 fairly productive I think today, is that if the case were to go

19 to you tomorrow, you would stay until 4:00 or such time as you

20 would reach a verdict.

21          I do want you to understand that the exception to our

22 general rule, which is we take afternoons off and work on other

23 subjects is that once you are in deliberations you will stay

24 until four.

25          Any logistical questions from members of the jury?

1   Good.  Please rise for the jury.

2              (At 12:57 p.m., jury leaves.)

3              THE COURT:  We are outside of the purview of the

4   jury.  Counsel, if I could get five minutes of your time right

5   now just to make sure that we have resolution on the

6   instructions for the jury.

7              See you in chambers in a couple minutes.

8              MR. VAILLIENCOURT:  Thank you.

9              (At 12:58 p.m., court recessed.)

10

11

12

13                         *  *  *  *  *

14                    C E R T I F I C A T E

15      I certify that the foregoing is a correct transcript
        from the proceedings in the above-entitled matter.
16

17

18                        *Carol M. Harrison*

19   Date: 11-16-2022    Carol M. Harrison, RMR, FCRR
                         Official Court Reporter
20                       United States District Court
                         Eastern District of Michigan
21                       1000 Washington Avenue
                         Bay City, MI  48708
22

23

24

25

US v. Zube - Trial - Volume 2 - March 24, 2022